**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BRAD BULLOUGH, Derivatively on Behalf of ARCHER-DANIELS-MIDLAND COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>JUAN LUCIANO, MICHAEL BURKE, THEODORE COLBERT, JAMES COLLINS, TERRELL CREWS, ELLEN DE BRABANDER, SUZAN HARRISON, PATRICK MOORE, DEBRA SANDLER, LEI ZHANG SCHLITZ, KELVIN WESTBROOK, VIKRAM LUTHAR, RAY YOUNG, VINCENT MACCIOCCHI, FRANCISCO SANCHEZ, DONALD FELSINGER, and PIERRE DUFOUR,<br><br>Defendants,<br><br>and,<br><br>ARCHER-DANIELS-MIDLAND COMPANY,<br><br>Nominal Defendant. | Case No:<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, by and through his undersigned counsel, derivatively on behalf of Archer-Daniels-Midland Company ("ADM" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes

that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' (defined below) violations of state and federal law and breaches of fiduciary duties that have occurred from April 30, 2020, through at least January 21, 2024 (the "Relevant Period") and have caused substantial harm to the Company.

2. ADM is an agricultural supply chain manager and processor. The Company's operations are organized into three reportable business segments: Ag Services and Oilseeds, Carbohydrate Solutions, and Nutrition. The Nutrition segment is engaged in the manufacturing, sale, and distribution of a range of ingredients and solutions, including plant-based proteins, natural flavors, flavor systems, natural colors, emulsifiers, and other specialty food and feed ingredients. The Nutrition segment serves various end markets including food, beverages and nutritional supplements for humans, and complete feed, feed premix, and additives, pet food and pet treats for livestock, aquaculture, and pets.

3. The Company's historical business was reliant on trading in agricultural commodities, which are highly volatile and generate low profit margins. The Company explained in SEC filings that "wide fluctuations" in the "availability and prices of agricultural commodities" result in "volatility … in the Company's operating results." This volatility and the Company's low margins made ADM a less attractive investment and as a result, ADM's stock price stagnated because investors saw little long-term value or growth in such a high-volatility business.

4. Over the past decade and in response to commodity price volatility in its legacy agricultural commodities trading business, ADM has tried to expand its Nutrition business and spent billions of dollars in that pursuit. This strategic expansion of the Nutrition business included the acquisitions of WILD Flavors in 2014 for $3 billion. WILD Flavors created and sold flavor systems, fruit concentrates, and other ingredients to be used in food sold to end-consumers. According to Defendant Juan Luciano, the WILD Flavors acquisition would provide "high-margin low volatility" and access to "high growth markets that can be a grow engine." Then, in late 2023, ADM announced the acquisition of UK-based flavor and ingredient firm FDL. Different than its legacy businesses, the Nutrition segment focused on products further down the consumer chain, which were expected to provide more sustainable and stable profit margins.

5. The Company's investments in animal feed and pet nutrition did not have the desired effect and failed to produce the desired results. At the same time, ADM's Nutrition segment was under increased pressure resulting from weak demand for meat alternatives and other products as well as downtime at a large soy processing facility. In October 2023, the Company disclosed that Nutrition revenues had decreased 4% to $1.8 billion due to lower sales volumes, Nutrition operating profit had decreased 22%, and both Human and Animal Nutrition results were lower compared to the third quarter of 2022.

6. During the Relevant Period, Defendants made false and/or misleading statements, as well as failed to disclose material facts about the performance and prospects of the Company's Nutrition segment, its accounting practices, and the strength and effectiveness of ADM's internal controls. Defendants repeatedly represented that the Nutrition segment was a future profit-driver for ADM, suited to capitalize on healthier eating trends and rising consumer demand for natural

ingredients and flavoring. Defendants also convinced investors that Nutrition segment growth would result in greater diversification and earnings stability for the Company, which would appeal to investors given ADM's historical results being correlated with the cyclical commodities market.

7. Unbeknownst to shareholders, however, the Nutrition segment's reported growth from 2020 through 2022 was illusory – the product of improper accounting practices. Defendants doubled down on their misrepresentations by downplaying the segment's eventual decline in 2023. As ADM enacted an aggressive acquisition campaign, shareholders were under the impression that the Nutrition segment was growing rapidly. In truth, Defendants' accounting practices for the segment misrepresented its true financial results and prospects, including its operating profits (or "OP"). Defendants enacted this scheme because they were incentivized to create the appearance of a diversified business by inflating the performance of the Nutrition segment, and certain Defendants were further incentivized by stock awards that were directly tied to the performance of the Nutrition segment from 2020 to 2022. As a result, the Company's business and prospects were much worse than represented, causing the price of ADM common stock to trade at artificially inflated levels.

8. On January 21, 2024, the truth was revealed when the Company announced that it had placed its Chief Financial Officer ("CFO") Vikram Luther on leave. ADM stated that Mr. Luther's "leave is pending an ongoing investigation being conducted by outside counsel for ADM and the Board's Audit Committee regarding certain accounting practices and procedures with respect to ADM's Nutrition segment, including as related to certain intersegment transactions." The Company also stated that its investigation was initiated in response to its

receipt of a voluntary document request by the SEC. As a result, the Company delayed its Q4 and FY 2023 earnings release and withdrew its outlook for the Nutrition segment.

9. On this news, the Company's common stock dropped by $16.23 per share, or approximately 24%, from $68.19 per share to close at $51.69 on January 22, 2024, wiping out approximately $8.8 billion of the Company's market value. The decline in the Company's stock was historic, representing the largest single-day percentage decline in the Company's stock price since 1929.

10. Defendants have admitted that they violated the generally accepted accounting principles ("GAAP") and Company policy by falsely overstating profits of the Nutrition segment from 2018 through 2023. Defendants were incentivized to inflate and conceal the truth about the Nutrition segment's results because compensation was tied to improving its profits. As detailed herein, several executives and Defendants have been forced out of the Company (and potentially leadership roles at other public companies) due to this misconduct, the Company was required to restate financial results, and both the SEC and the United States Department of Justice ("DOJ") has launched investigations into the Company's fraudulent accounting practices.

11. The fraudulent accounting practices involved intercompany sales of raw materials from the Company's other business segments to the Nutrition segment at costs well below market rates. Accordingly, the Nutrition segment produced overstated profits, which Defendants routinely highlighted during the Relevant Period because of the emphasis management had placed on the segment and in turn, the investor and analyst focus thereon. In valuing and placing price targets on the Company, analysts placed greater importance on the Nutrition segment to the Company's outlook as compared to its other segments.

12. However, both investors and analysts were unaware that the Nutrition segment's results were the product of accounting fraud. Indeed, during the Relevant Period, the Defendants made false and misleading statements to conceal the accounting fraud, falsely claiming that intersegment sales were completed at market rates in compliance with GAAP and ADM policy, and thereby falsely overstating the performance and profitability of the Nutrition segment. When the accounting fraud was uncovered, ADM's stock price plummeted and more than $8 billion in market capitalization was erased.

13. ADM had a long-standing and publicly disclosed accounting policy regarding intersegment sales, which required the Company to record those intersegment sales at prices reflecting the market rates. Under this policy, the Company's other segments would charge the Nutrition segment the same price for raw materials as it would charge an independent customer. As the Nutrition segment obtained a significant amount of raw materials from ADM's other business segments, intercompany prices were impactful on both the Nutrition segment's operating expenses and operating profits. Further, the policy was important to investors and analysts because it required transparency on the performance of the individual business segments of the Company.

14. ADM's and Defendants' control on both sides of the intersegment transaction created potential for fraud because a simple price adjustment could lead to overstating a segment's results. GAAP addressed this by requiring the Company to disclose and then comply with its stated accounting policy for such intercompany sales. In the absence of a disclosed policy, segment performance could be obscured, making it difficult for investors and analysts to evaluate the success and future prospects of the Company's entrance into the Nutrition business.

15. The Company did not follow its publicly disclosed and GAAP-compliant policy from 2018 through 2023. ADM admitted in the Company's Annual Report filed on Form 10-K for the period ending December 31, 2023, that "intersegment sales … were not recorded at amounts approximating market" and were therefore recorded "at amounts that were not in accordance with [GAAP]." As a result, the Company overstated the Nutrition segment's operating profit by more than $200M and by as much as 25% of the Company's reported quarterly Nutrition operating profit during the Relevant Period. Further, the Company admitted that internal controls over financial reporting were ineffective during the Relevant Period and recognition of "a material weakness in [ADM's] internal control over financial reporting relating to the Company's accounting practices and procedures for intersegment sales."

16. Defendants concealed the accounting fraud by and through Individual Defendants (defined below) false and misleading statements. For each quarter during the Relevant Period, the Individual Defendants reported operating profits for the Nutrition segments, which were artificially inflated and overstated, and were subsequently reduced and restated. Additionally, the Individual Defendants represented that "[i]ntersegment sales have been recorded at amounts approximating market," assured investors that financial statements were "prepared in accordance with [GAAP]," and declared that "internal control over financial reporting was effective." However, the Company's internal controls were not effective and the Nutrition segment's operating profits were fraudulently and materially overstated based on violations of the Company's accounting policy and GAAP.

17. Moreover, the Individual Defendants misled investors by attributing the Nutrition segment's improved performance and margins to factors such as "growth in alternative proteins," positive currency timing," "robust demand for fiber," "strength in amino acids," and "solid

performance in texturants." These statements were false and misleading because they concealed that the Nutrition segment's improvements were driven largely by improperly adjusted intercompany sales and accounting fraud.

18. The account fraud and the misstatements caused the Company's stock price to surge going from approximately $35.00 per share at the start of the Relevant Period up to highs of nearly $100 per share. With the stock price artificially inflated, Defendants Luciano (Chief Executive Officer) ("CEO") and Chairman of the Board of Directors ("Board"), Ray Young (former CFO), Vincent Macciocchi (former President of Nutrition, and Chief Sales and Marketing Officer), and Vikram Luthar (former CFO), cashed out more than $107M worth of Company stock, including at prices close to the Relevant Period high, in excess of $90 per share, and received more than $151M in total compensation. Directors Michael S. Burke, Suzan F. Harrison, Debra A. Sandler and Kelvin R. Westbrook cashed out over $3M in Company stock during the Relevant Period while in possession of material, non-public information.

19. After disclosure of the accounting fraud, the Company and media have revealed that the DOJ launched and was escalating an investigation into the Company's accounting practices for intersegment sales. The DOJ issued grand jury subpoenas to current and former Company employees and as part of its investigation, interviewed former employees in connection with ADM's accounting practices. The Company would later issue the Restatement, admitting its GAAP violations and to overstating the Nutrition segment's operating profits. The Company terminated Defendant Luthar's employment, Defendant Macciocchi was forced to "retire" and forfeit up to $2M in stock awards, and Defendant Young resigned from public-company board positions following revelation of the accounting fraud.

## **JURISDICTION**

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

23. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

24. **Plaintiff Brad Bullough** is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

25. **Nominal Defendant ADM** is a multinational food processing and commodities trading company incorporated in Delaware with its headquarters located at 77 West Wacker Drive, Suite 4600, Chicago, Illinois, 60601. The Company's common stock trades on Nasdaq Global Select Market under the ticker symbol "ADM."

**Director Defendants**

26. **Defendant Michael Burke** ("Burke") is the retired Chairman and has served on the Board since May 2018. Defendant Burke serves as chair of the Audit Committee, and a member of the Executive and Nominating and Corporate Governance committees. During the Relevant Period and based on material, adverse, non-public information, Defendant Burke sold 1,696 shares of Company stock for proceeds of over $123,000.

27. **Defendant Theodore Colbert III ("**Colbert") has served on the Board since May 2021. Defendant Colbert serves as a member of the Audit and Compensation and Succession committees.

28. **Defendant James Collins Jr.** ("Collins") has served on the Board since August 2022. Defendant Collins serves as a member of the Compensation and Succession, and Sustainability and Corporate Responsibility committees.

29. **Defendant Terrell Crews** ("Crews") has served on the Board since May 2021. Defendant Crews serves as lead director and a member of the Executive Committee.

30. **Defendant Ellen de Brabander** ("de Brabander") has served on the Board since 2023. Defendant de Brabander serves on the Audit and Sustainability and Corporate Responsibility committees.

31. **Defendant Suzan Harrison** ("Harrison") has served on the Board since May 2017. Defendant Harrison serves as Chair of the Sustainability and Corporate Responsibility Committee as well as a member of the Executive and Audit committees. During the Relevant Period and based on material, adverse, nonpublic information, Defendant Harrison sold more than 6,000 shares of Company stock

32. **Defendant Patrick Moore** ("Moore") has served on the Board since November 2023. Defendant Moore is Chair of the Nominating and Corporate Governance Committee and serves as a member of the Executive and Audit committees.

33. **Defendant Debra Sandler** ("Sandler") has served on the Board since May 2016. Defendant Sandler serves as a member of the Audit and Nominating and Corporate Governance committees. During the Relevant Period and based on material, adverse, non-public information, Defendant Sandler sold nearly 8,500 shares of Company stock for proceeds of approximately $689,000.

34. **Defendant Lei Zhang Schlitz** ("Schlitz") has served on the Board since May 2019. Defendant Schlitz is a member of the Compensation and Succession, and the Sustainability and Corporate Responsibility committees.

35. **Defendant Kelvin Westbrook** ("Westbrook") has served on the Board since November 2003. Defendant Westbrook serves as Chair of the Compensation and Succession Committee and as a member of the Executive, and the Nominating and Corporate Governance

committees. During the Relevant Period and based on material, adverse, non-public information, Defendant Westbrooks sold nearly 29,000 shares of ADM stock for proceeds of over $2 million.

36. The above-named defendants at ¶¶ 26-35, along with Defendant Luciano below, are referred to herein as the "Director Defendants."

**Officer Defendants**

37. **Defendant Juan Luciano** ("Luciano") has served as Chief Executive Officer ("CEO") and President of the Company since January 2015, and as Chairman of the Board since January 2016. Defendant Luciano also serves as a member of the Executive Committee. After joining the Company in 2011, Defendant Luciano served as Executive Vice President and Chief Operating Officer ("COO") from then through February 2014 and then, solely as COO from February 2014 through December 2014. During the Relevant Period and based on material, adverse, non-public information, Defendant Luciano sold over 1 million shares of ADM stock for proceeds of nearly $84 million.

38. **Defendant Vikram Luthar** ("Luthar") served as CFO of the Company beginning in April 2022, as Senior Vice President of the Company beginning in March 2015, and Company director since 2004. Defendant Luthar was placed on administrative leave effective January 19, 2024. Defendant Luthar previously served as CFO of the Company's Nutrition business segment from January 2020 to April 2022. During his tenure, Defendant Luthar also served as: Head of Investor Relations (June 2021 through July 2022); President of Nutrition's Health & Wellness business (March 2018 through January 2020); President of Nutrition's Bioactives business (February 2017 through March 2018); President of Nutrition's Enzymes business (December 2015 through February 2017); CFO of the ADM's "Corn Processing" segment (March 2014 through February 2017); Group Vice President, Finance (January 2012 through March 2015),

and Vice President and Treasurer (November 2004 through December 2011). On April 19, 2024, Defendant Luthar entered into a Transition Agreement through which his "resignation" became effective on September 30, 2024. During the Relevant Period and based on material, adverse, nonpublic information, Luthar sold 7,500 shares of ADM stock for proceeds of $672,000.

39. **Defendant Ray Young** ("Young") served as CFO of the Company from December 2010 until April 2022. After transferring the title of CFO to Luthar, Defendant Young assumed the position of Vice Chairman of the Company before retiring at the end of 2022. During the Relevant Period and based on material, adverse, nonpublic information, Defendant Young sold more than 235,000 shares of ADM stock for proceeds of nearly $16 million.

40. **Defendant Vincent Macciocchi** ("Macciocchi") served as Senior Vice President of ADM and President of Nutrition from May 2015 through the end of 2023. Macciocchi also served as the Company's CSMO from January 2020 through the end of 2023 through which he was responsible for ADM's global sales and marketing activities. Macciocchi joined the Company when ADM acquired WILD Flavors in 2014, where he previously as a president and officer since 2012. On November 10, 2023, after receipt of notice from the SEC regarding the investigation into ADM's intersegment sales and the Nutrition segment, ADM announced that Macciocchi would "retire" from the Company at the close of 2023, forfeiting as much as $2 million in performance stock awards. During the Relevant Period and based on material, adverse, nonpublic information, Defendant Macciocchi sold more than 93,000 shares for proceeds of approximately $12 million.

41. The above-named defendants at ¶¶ 37-40 are referred to herein as the "Officer Defendants."

**<u>Former Director Defendants</u>**

42. **Defendant Francisco Sanchez** ("Sanchez") served on the Board since from May 2014 to May 2023. Defendant Sanchez served on the Audit Committee. Defendant Sanchez signed and thus, personally made the false and misleading statements contained in the 2020, 2021, and 2022 Annual Reports, as detailed *infra*. During the Relevant Period and based on material, adverse, non-public information, Defendant Sanchez sold approximately 12,400 shares of ADM stock for proceeds exceeding $883,000.

43. **Defendant Donald Felsinger** ("Felsinger") served as Lead Director and on the board from 2009 to May 2023. Defendant Felsinger signed and thus, personally made the false and misleading statements contained in the 2020, 2021, and 2022 Annual Reports, as detailed *infra.*

44. **Defendant Pierre Dufour** ("Dufour") Defendant Dufour served on the Board from 2010 through to 2022. Defendant Dufour was a member of the Board's Audit Committee and Sustainability and Corporate Responsibility Committee. Defendant Dufour signed and thus, personally made the false and misleading statements contained in the 2020 and 2021 Annual Reports, as detailed *infra*. During the Relevant Period and based on material, adverse, non-public information, Dufour sold over 9,000 shares for proceeds of more than $542,500.

45. The above-named defendants at ¶¶ 42–44 are referred to herein as the "Former Director Defendants."

46. The Director Defendants, Officer Defendants, and Former Director Defendants are collectively referred to herein as the "Individual Defendants."

## FACTS

**Background:**

47. ADM is a global agricultural supply chain manager and processor and a human and animal nutrition provider with a broad portfolio of ingredients and solutions. ADM'S operations are organized, managed, and classified into three reportable business segments: Ag Services and Oilseeds, Carbohydrate Solutions (also referred to herein as Carb Solutions), and Nutrition. The Ag Services and Oilseeds segment includes activities related to the origination, merchandising, transportation, and storage of agricultural raw materials, and the crushing and processing of oilseeds into vegetable oils and protein meals. The Carbohydrate Solutions segment is engaged in corn and wheat wet and dry milling and other activities. The Nutrition segment serves various end markets including food, beverages, nutritional supplements for humans, and complete feed and premix for livestock, aquaculture, and pet food. The Nutrition segment engages in the creation, manufacturing, sale and distribution of a wide array of ingredients and solutions including plant-based proteins, flavors and colors derived from nature, flavor systems, emulsifiers, soluble fiber, polyols, hydrocolloids, probiotics, prebiotics, postbiotics, enzymes, botanical extracts, and other specialty food and feed ingredients and systems. The Nutrition segment also includes activities related to the procurement, processing and distribution of edible beans, the processing and distribution of formula feeds and animal health and nutrition products and the manufacture of contract and private label pet treats and foods.

48. Historically, the Company focused on buying, storing, and selling grain and profiting from exclusive information about supply and demand. As technology advanced and facilitated the spread of information, the Company sought to diversify and expand into nutrition, increasing its focus on providing customers with products to help them change the formulation of processed food, such as reducing sugar content while preserving sweetness, or alter its

appearance. The Company's historical business lines were facing increased competition for soybeans processing, as well as declining margins for soybean crushing and ethanol, for which the Company is the third-largest United States producer. As a result, successful diversification and growth of the Nutrition segment became paramount to the Company's success and future.

**The Company Diversifies and Expands into Nutrition**

49. Prior to the Relevant Period and in an effort to counteract its legacy business segments' thin operating margins and earnings volatility, ADM engaged in a growth strategy focused on the Nutrition segment, which had been partially launched in 2013 as a "specialty ingredients division." Defendant Luciano explained the strategic focus on the Nutrition segment was driven by the desire for a "core" business with its "own margins and getting margins closer to customer, where they were less capital intensive."

50. As opposed to the Ag Services and Oilseeds and Carb Solutions segments, the new Nutrition segment was focused on creating higher-margin, higher-growth products to be used by end-consumers. The Nutrition segment's products include "Human Nutrition" products such as flavor systems, special ingredients and plant-based proteins, and "Animal Nutrition" products such as animal feed and additives.

51. ADM's Human Nutrition business began in earnest with the acquisition of WILD Flavors in 2014. Defendant Macciocchi has stated that this acquisition was the "foundation of what is today ADM [Human] Nutrition." WILD Flavors was a Swiss-German natural ingredient company, which was touted as "the world's leading provider of natural flavor systems to the food and beverage industry." Defendant Luciano would later explain that the addition of WILD Flavors diversified ADM by providing access to "high margin, low volatility, high growth markets that can be a growth engine." At present, the WILD Flavors acquisition is the largest in

the Company's 100 plus year history. Following the acquisition of WILD Favors, ADM created a new reporting segment: WILD Flavors and Specialty Ingredients ("WFSI"), the predecessor to the Nutrition segment, which would later include not only Human Nutrition, but also Animal Nutrition.

**The Nutrition Segment Does Not Deliver Growth**

52. When compared to ADM's legacy businesses, the Nutrition segment was touted as an exciting growth opportunity, particularly in the area of operating profit, and, in turn, a vehicle for increasing the Company's stock price. Operating profit is calculated by subtracting the costs of operations (including payment for raw materials), as well as asset-related depreciation and amortization, from total revenue. The Individual Defendants have referred to operating profit by the acronym "OP." ADM's operations in the nutrition industry, which offered stable and growing operating profit, was important in making ADM a more attractive investment because the legacy segments were subject to significant cost fluctuations and unpredictable profitability. The Nutrition segment was intended to, at minimum, offset, if not solve, those issues.

53. However, the Nutrition segment was not a magic elixir because the specialty ingredients business actually hampered results, causing the Nutrition segment to experience volatility and fail to grow in the first several years. Indeed, Nutrition reported $323 million in operating profit in 2015 only decline in 2016 down to $273 million and then rebound to $311 million in 2017, but still short of 2015's results. In that same timeframe, the Company's stock experienced similar results declining from around $50 per share in 2015 to around $40 at the close of 2017.

54. In a February 7, 2017, report, analysts from Credit Suisse reported on the struggles of the Nutrition business, explaining that "all segments gr[ew] earnings except WFSI where the specialty ingredients business remains weak." Without the expected operating profits and stability, analysts dinged ADM. For instance, on May 2, 2017, a Morgan Stanley analyst reiterated a price target of $33, far below the Company's $45 stock price from the prior day, explaining that "WFSI performance will not justify the high multiple paid / the low ROIC garnered." A few months later, a BMO analyst reiterated a price target of $41 ($2 below the prior day's closing price), reporting that "WFSI, particularly in special ingredients, continues to fall short of expectations."

The Company Inflates Nutrition's Profits to Meet Strategic Goals

55. Having invested billions of dollars and with mounting analyst and investor pressure to reverse sluggish results, the Individual Defendants resorted to accounting manipulation to boost the Nutrition segment's results at the expense of ADM's legacy segments – Ag Services and Oilseed and Carb Solutions.

56. As of January 1, 2018, the Individual Defendants re-organized the Company's reporting structure to make Nutrition one of the Company's three reportable segments. In doing so, the Company renamed the WFSI segment Nutrition and brought "Animal Nutrition and certain product line previously reported in Carb[]Solutions" under the Nutrition segment.

57. Given the greater focus on end-consumer products, the Nutrition segment purchased certain raw materials from within the Company – the Ag Services and Oilseeds and Carb Solutions segments – to be used as base ingredients. As an analyst noted in May 2020, a "majority of base ingredients in Nutrition are sourced from ADM." For Animal Nutrition,

specifically, this represented a substantial change because previously as part of Carb Solutions, Animal Nutrition had obtained its raw materials largely from within its own operating segment.

58. The revised corporate structure presented the Individual Defendants with the opportunity to manipulate the numbers. Intercompany sales, like those between Nutrition and the other reporting segments, are an area ripe for accounting manipulation and fraud. For example, Deloitte & Touche LLP ("Deloitte") has included "Intercompany Manipulations" on its published list of "fraud schemes" employed by management and specifically noted that intercompany sales may be used to "over/understate balances."[1] Deloitte also explained that the "primary risk" of improper intercompany accounting is "financial misstatements, which can impact the company's reputation, stock price, and shareholder value."[2] Accordingly, where a company is engaged in intercompany transactions, strong internal controls over financial reporting are of critical importance to ensure that the Company's accounting for intercompany transactions is carefully monitored.

59. GAAP and specifically ASC 280, Segment Reporting, and ASC 606, Revenue from Contracts with Customers, required that the Company accurately record and disclose its basis of accounting for intersegment transactions, including the pricing methodology when intersegment sales are made from one segment to another. In the absence of compliance with such a rule, intercompany sales prices could be manipulated by changing the pricing

---

[1] *Sample listing of Fraud Schemes*, Deloitte & Touche LLP (2009), https://www2.deloitte.com/content/dam/Deloitte/in/Documents/risk/Corporate%20Governance/Audit%20Committee/in-gc-fraud-schemes-questions-toconsider-noexp.pdf (last accessed April 14, 2025).

[2] *Cleaning the Mess Up Under the Bed,* Deloitte & Touchee LLP (2017), https://www2.deloitte.com/content/dam/Deloitte/us/Documents/risk/us-riskintercompany-accounting-survey.pdf (last accessed April 14, 2025).

methodology and, in turn, reported sales and profits would not accurately reflect the performance of each segment.

60. ADM disclosed that its policy was to record intersegment sales at market rates, consistent with revenue principles under ASC 606. The Company's policy meant when Nutrition purchased raw materials from another operating segment, the sale should have been recorded at market price as though the raw materials were purchased from an independent third party.

61. As later admitted in the Restatement, the Company violated this policy and GAAP on its "intersegment" sales by secretly selling raw materials to the Nutrition segment at discounted prices or with rebates for less than market prices. In doing so, ADM improperly recorded lower operating costs for the Nutrition segment and therefore, inflated the segment's operating profits by tens of millions of dollars year after year. In the Restatement, ADM admitted (i) suffering from a "material weakness in its internal control over financial reporting related to the Company's accounting practices and procedures for intersegment sales"; (ii) reporting "intersegment sales that were not recorded at amounts approximating market" and thus, were recorded "at amount that were not in accordance with ASC 606, Revenue from Contracts with Customers"; and (iii) inflating Nutrition segment operating profits from 2018 through 2023.

**Nutrition is the Centerpiece of the Company's Growth Strategy**

62. The manipulation of ADM's accounting bore immediate fruit. Based on the fraud, the Company was able to report operating profits of $339 million, a 9% growth rate, and the highest Nutrition business operating profit since the WILF Flavors acquisition. But-for the accounting scheme, the Nutrition segment would have reported flat operating profit compared with 2017 and a 0% growth rate for the Nutrition segment.

63. In February 2019, ADM completed a $1.8 billion acquisition of Neovia, "a leading global animal nutrition business" that Defendant Lucian represented would be "a strong platform for future growth." During a July 2, 2018, conference call, Defendant Luciano discussed how the Neovia acquisition was a part of "how [ADM is] building an important growth machine, [the] integrated Human and Animal Nutrition business units." He explained that "[f]or the last 4 years, we have been significantly expanding" the Nutrition segment as part of a "targeted expansion down the value chain into higher margin, differentiated products for Human and Animal Nutrition."

64. Then, in a December 18, 2023, press release regarding the acquisition of Revela Foods, ADM stated that "[o]ur flavors business is an important pillar of our Nutrition growth strategy, and we are continuing to add to our flavors pantry to ensure we remain the partner of choice for customers around the globe." Additionally, the Company noted the expansion of its flavors portfolio through acquisition and stated that it has "expanded its flavors capabilities globally" with acquisitions including Flavor Infusion South America, organic investments including facilities in China and Germany, and a "growing network of innovation centers spanning Europe, Asia, Latin America and North America."

65. With the newly created operating profit growth in 2018, by and through accounting fraud, and having expanded the business through approximately $5 billion in investments and acquisitions, the Nutrition segment became the centerpiece of the Company's strategy, as well as investor perception and valuation.

66. In 2019, Nutrition reported a year-over-year operating profit increase of 23% while Ag Services and Oilseeds and Carb Solutions each declined. The Individual Defendants reassured investors about the state of the Company, citing the importance of the Nutrition

segment and the strength of its results as cover for the disappointing results of legacy segments. For instance, on a January 30, 2020, conference call, Defendant Luciano highlighted the "impressive year of growth for Nutrition" and the expectation of "another year of 20%-plus growth in profitability in our Nutrition segment in 2020." Defendant Luciano reinforced the long-term importance of Nutrition and stating that Nutrition would have a 25% share of the Company's operating profit "within the next 3 to 4 years."

67. However, the Nutrition segment's growth between 2020 and 2022 was illusory, the product of the Individual Defendants' improper accounting practices. Accordingly, the Company's business and prospects were much worse than previously represented and as a result, ADM's stock price was trading at artificially inflated levels. Over the course of the Relevant Period, the Company's stock price climbed from approximately $35 at the outset to highs of nearly $100 per share.

**The Importance of Nutrition's Results to the Stock Price and Executive Compensation**

68. In March 2020, the Company announced alterations to "the short-term and long-term [executive] incentive compensation plans" to "emphasize [the Company's] focus on the Nutrition segment[.]" In one example, the Company replaced the adjusted EBITDA performance for executive compensation with the "operating profit growth in the Nutrition segment." Thus, executive compensation no longer reflected the Company's overall performance and instead, would be tied directly to the Nutrition segment's performance.[3]

[3] In the related Securities Class Action, (defined below) in denying the motion to dismiss, the Court found that "Defendants' compensation structure enabled them to directly benefit from the fraudulent accounting practices" and that "the change in compensation structure makes it more likely that the Individual Defendants … were aware of the fraud." Securities Class Action, ECF No. 109, at 10, 12.

69. Although tying executive compensation to Company performance can align management and shareholder interests, it can also create perverse incentives for the opposite because management is incentivized to inflate short term performance at the expense of long-term shareholder interests. For instance, in a February 23, 2016, article published by the *Harvard Business Review*, professors of Organizational Behavior and Strategic Management correlated "large bonuses and stock options" with "overly risky behavior and short-term strategies" that led to the "global economic crisis of 2008." The authors stated that "[w]hen people's remuneration depends strongly on a financial measure, they are going to maximize their performance on that measure, no matter how" and that "cooked books, false sales reports, and illegal means to performance emerge when financial incentives cause leaders to care more about looking good in terms of results than actually doing well in terms of creating value."[4]

70. Here, the Individual Defendants enacted and continued their scheme to ensure increased compensation and an inflated stock price rather than reporting ADM's intersegment sales manipulation and accounting fraud.

71. Predictably, the Nutrition segment's influence continued to reign over the Company's business as the accounting fraud remained in place. The Nutrition segment's operating profits grew 37% in 2020 and another 20% in 2021, reaching as high as 17% of total operating profits. From 2018 through 2022, the Nutrition segments profits more than doubled, jumping from $339 million to $736 million. Management continued to create the expectation that the Nutrition segment growth was just beginning, stating that the Company planned for "$1 billion" in Nutrition operating profits in "2024."

---

[4] Dan Cable, et al., *Stop Paying Executives for Performance*, Harvard Business Rev. (Feb. 23, 2016) https://hbr.org/2016/02/stop-paying-executives-for-performance (last visited: April 14, 2025).

72. In addition to the significant profit growth, the Nutrition segment had lower capital expenditures than ADM's other operating segments. Accordingly, the Nutrition segment could yield the same level of profits, but at a mere fraction of the cost. In a January 26, 2021, conference, Defendant Luciano explained just that "Nutrition is not a heavy capital-intensive business … you have 1:6 [] profitability to capital in the commodity business, you have like 1:1 in [the Nutrition] business."

73. During a March 3, 2021, investor call, Defendant Young declared that "becoming a global nutrition player has been actually a very important core pillar of our strategy going forward." Then, just months later, on a July 27, 2021 earnings call, Defendant Luciano was clear that Nutrition was expected to continue to grow while legacy segments became less important, stating in pertinent part:

> [W]hen I look at the 3 businesses and we move them forward through 5 years, we see Ag Services and Oilseeds growth moderately, but it grows. We see Carb Solutions being flat to slightly declining in our forecasting. And then we see a strong growth in Nutrition. That's kind of the – if you will, the algorithm of how the business has moved."

74. In a September 21, 2021, call, Luciano explained that Nutrition had "replaced" the Company's more volatile and faltering ethanol business. Defendant Luciano stated that:

> "[T]he largest decline was ethanol. We don't have a funnel in those earnings like we had it in maybe 2014. ***We have replaced that with now a Nutrition division.***"

75. During a December 10, 2021, call, Defendant Young credited "the Nutrition business" with contributing "a significant amount" to the Company's growth and further stated that "[a] major driver of [ADM growth] will be our Nutrition business."

76. Then, on September 18, 2023, Defendant Luciano explained that the Nutrition segment was created to and would, indeed, replace highly volatile operating profits from legacy segments. In pertinent part, Defendant Luciano stated:

> So when we created the Nutrition business very simplistically, I always thought when I joined the company, we had about $500 million of ethanol business and about $400 million of a trading business that I didn't understand very well the predictability of it. ***So I set myself the goal that I said, I need to replace $1 billion of OP with profit because that may go away at one point in time, and I cannot trust on the volatility of that.***

77. Analysts were convinced by Individual Defendants' proclamations that the Nutrition segment's stable results would "replace" the Company's volatile legacy segment earnings. For instance, a Barclays analyst noted in October 2020 that "a further shift within the broader ADM portfolio towards nutrition should be welcomed by investors, as this business has not only at [sic] high levels of profitability, it also has a fairly stable level of profitability in any given quarter." In November 2020, a Barclays analyst echoed management that "nutrition is a clear focus for ADM's management team" and applauded the Company's efforts to achieve "less volatile earnings over time as its Nutrition segment further gains relevance." Also in November 2020, BMO analysts praised the "sustainably high growth, low volatility earnings stream in Nutrition." Then, the next month in December 2020, Barclays analysts would state that "[a] relatively higher share of its nutrition business should give ADM several benefits: 1) higher consolidated profitability, 2) less earnings volatility, and 3) stable cash flows, which ultimately should drive higher valuation multiples in the future."

78. Based on management's "clear focus" and positive statements, analysts repeatedly emphasized the importance the Nutrition segment's earnings relative to the Ag Services and Oilseeds and Carb Solutions earnings. For instance, in October 2020, a J.P. Morgan analyst

assigned the Nutrition segment a valuation multiplier of 1.85 times the multiple assigned to the legacy segments. Accordingly, a dollar in profit attributed to the Nutrition segment was worth significantly more to investors and in turn, the Company's stock price, than a dollar of profit in the legacy segments.

79. In January 2023, a Credit Suisse analyst explained that "the Nutrition segment represents the company's highest value business unit" and was convinced by the Company's target of $1.25 to $1.5 billion in Nutrition operating profit in 2025. Also in January 2023, a J.P. Morgan analyst acknowledged the importance of the Nutrition segment because without Nutrition growth earnings would "shift from the higher multiple Nutrition segment (where peers typically trade at mid-teens EBITDA multiples) towards the lower multiple AS&O segment (where peers trade at high-single-digit multiples)."

80. In another example of how important analysts viewed the Nutrition segment, in July 2023, a J.P. Morgan analyst reiterated its "Neutral" rating on ADM stock even after earnings that exceeded analyst expectations and increased guidance. The analyst explained that the "Neutral" rating was due to reduced guidance for the Nutrition segment and "the downward earnings revision to the higher multiple Nutrition segment is more meaningful to our valuation than the total ADM earnings." Similarly, in October 2023, ADM again beat expectations, but Bank of America analysts lowered their price target due to "lower Nutrition contribution." The analysts explained that although their overall earnings estimates had not changed, they "the earnings mix shift warrant[ed] a downward adjustment to ADM's valuation."

81. In October 2023, Defendant Luthar stated that he expects continued growth in the Nutrition segment's revenue opportunity pipeline "with significant conversion continuing as ADM moves past some near-term demand weakness." At the same time, ADM was continuing

its aggressive acquisition strategy, announcing in December 2023, the acquisitions of Revela Foods and FDL, both aimed to support the Nutrition segment. In connection with the Revela Foods acquisition, the Company boasted about its flavor investments, stating "ADM is continuing to add to its broad portfolio of flavor ingredients and solutions as it builds a global leader in nutrition."

**Defendants Can No Longer Conceal and Are Forced to Admit to the Accounting Fraud**

82. During the Relevant Period, the Individual Defendants continued the illicit accounting scheme and benefitted from this misconduct. The Individual Defendants used the accounting fraud to boost the Nutrition segment's operating profits, allowing them to execute insider stock sales at artificially inflated stock prices and receive millions of dollars in executive compensation.[5]

83. While the Individual Defendants did not report the fraud, by 2023, the SEC had begun in its investigation into the Company's intersegment sales. On June 20, 2023, ADM received a "voluntary document request from the [SEC] relating to intersegment sales between the Company's Nutrition reporting segment and the Company's Ag Services and Oilseeds and Carbohydrate Solutions reporting segments."

84. After receiving the SEC document request, the Company and the Audit Committee purportedly retained outside counsel to assist with an internal investigation into

---

[5] A *Fortune* article reported that the Company's senior executives received shares worth about $72 million in January 2023. *See* Tarso Veloso, et al., *ADM Accounting Scandal Zeroes in on Nutrition Unit that was Key in Boosting Exec Stock Bonuses Past $70 million*, Fortune (Jan. 24, 2024), https://fortune.com/2024/01/24/admaccounting-scandal-nutrition-unit-70-million-stock-award-bonuses/ (last accessed April 14, 2025). Additionally, a *Reuters* article explained that ADM executives received million in compensation even while the Company was conducting an audit of prior financial statements and results. *See* Chris Prentice, et al., *Exclusive: ADM pays bonuses to senior executives in midst of government investigation, documents show*, Reuters (Mar. 21, 2024), https://www.reuters.com/business/finance/adm-pays-bonuses-senior-executivesmidst-government-investigation-documents-show-2024-03-21/ (last accessed April 14, 2025).

ADM's accounting practices and procedures with respect to the Nutrition segment including as related to intersegment sales. The Company's internal investigation concerned January 2018 through September 2023. However, the Company did not disclose the accounting fraud, the SEC investigation or its internal investigation to the investing public until many months later.

85. Finally, in January 2024, ADM disclosed the investigation and accounting fraud, and eventually restated and reduced the Nutrition segment's profit by tens of millions for each year dating back to 2018.

86. The accounting scheme permitted the Company to report inflated operating profits for the centerpiece of management's growth strategy – the segment was repeatedly touted as the key to future growth at the Company – and thereby cause the Company's stock to trade at artificially inflated prices. The significance of the fraud is evident in the ongoing SEC investigations, the DOJ having commenced a grand jury investigation, the placement of Defendant Luthar on administrative leave and his forced retirement, Defendant Macciocchi's abrupt retirement (from which he promptly returned to work elsewhere just one month later), and Defendant Young's resignation from prominent board positions at public companies "effective immediately."

87. These revelations caused the Company to delay its fourth quarter 2023 and full year 2023 earnings results. Further, ADM withdrew its outlook for the Nutrition segment. On this news, ADM shares plunged 24% and $8.8 billion in market capitalization and shareholder equity was erased in the downfall.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

88. On April 29, 2020, ADM issued a press release announcing financial results for the first quarter of 2020. The release reported that the Nutrition segment operating profit was

$142 million in the first quarter of 2020. Then, the next day, April 30, 2020, the Company held an earnings call concerning its financial results for the first quarter of 2020. During the call, Defendant Young stated:

> ***Nutrition continued its growth trajectory with record results. Our Human Nutrition business, formerly known as WFSI, delivered strong performance and growth across the broad portfolio, including Flavors, Specialty Ingredients and Health & Wellness. Increased sales revenue in North America and EMEA flavors, continued sales growth in alternative proteins and additional bioactives income helped drive improved results.*** As Juan mentioned earlier, we did see higher demand in some Human Nutrition areas as a result of new wins as well as some pantry loading effects. Animal Nutrition's improved year-over-year results were driven by a strong performance from Neovia, good volumes and margins in feed additives and solid sales in pet care. The prior year quarter also had been negatively impacted by about $10 million in upfront purchase price adjustments related to Neovia. Amino acids were negatively impacted by a year-over-year decline in the global pricing environment, though prices were directionally improved over Q4 of 2019. We are also very pleased that we met our Neovia synergy targets more than 2 years early.

89. Defendant Young further stated: "***For Nutrition, we feel confident that the business will continue to advance to another calendar year of 20%-plus growth.***"

90. In response to an analyst's question about the growth of the Nutrition business, Defendant Luciano stated:

> When talking about Nutrition, I said to all our investors over the last 1.5 years that they've been supporting us through all the investment phase in Nutrition. And Nutrition have not been showing that in the P&L because this was organic growth, and we have some growing pains into some of these assets as you build them and you have to finance them. But when you see now what's starting to happen is what we predicted before, is all those wins, all that innovation, we always said, we have our value proposition is resonating with our customers. We had that. That line was a little bit masked by all this organic growth that was coming. ***Now all that organic growth is hitting the P&Ls because these investments are maturing. And you're going to see that, and we grew 23% profit last year. We are growing – we're going to grow another north of 20% this year.*** You see WFSI during this. So take Neovia and Animal Nutrition out for a minute since the first quarter is a little bit of a strange comparison because we acquired this last first quarter. So -- but if you take WFSI, WFSI has grown earnings at 28% in the first quarter. So we continue a little bit the rhythm of 23% that we

> delivered last year. And flavors are growing at revenue at 7.8%. So we feel very good about that business. It's a very diversified business. And if anything, we're experiencing COVID with people that come back from this pandemic, like we've seen in Asia, is that people come back with the more -- with an enhanced focus on health and the importance of quality nutrition for their well- being. So we've seen the probiotics.
>
> ***Our Health & Wellness segment is up, like, 24% in terms of revenue***, because the sales of those products are -- for humans is, has been probably reemphasized by all this COVID. ***So we think that we are in the right segments. We think we have the right product mix. So we feel very bullish about continuing this performance for the Nutrition business.***

91. During the same call, an analyst queried management about "margin expansion" in Nutrition, and in response, Defendant Lucian emphasized that Nutrition was experiencing "***organic growth***" and that was showing in "P&Ls because these investments are maturing. And you're going to see that, and we grew 23% profit last year."

92. Next, on May 1, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2020. The 10-Q was signed by Defendant Young and contained signed Sarbanes-Oxley ("SOX") certification from Defendants Luciano and Young. In addition to reiterating the Nutrition segment's operating profit of $142 million, the 10-Q included representations that "intersegment sales have been recorded at amounts approximating market" and that "[t]he accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles (GAAP)."

93. The 10-Q also included a section entitled "Analysis of Statements of Earnings," which included an analysis of results for first quarter of 2020 relative to the first quarter of 2019. In the section concerning "[s]egment operating profit," the 10-Q reported that "Nutrition operating profit increased 75%," and cited factors such as "[i]ncreased revenues in North

America and EMEAI flavors, continued sales growth in alternative proteins, and additional bioactives income drove improved results" and "results improved year-over-year driven by strong performance from Neovia, good volumes and margins in feed additives, and solid sales in pet care."

94. Further, the 10-Q made representations that based on the evaluation of management regarding "effectiveness of the design and operation of the Company's disclosure controls and procedures … the Company's management, including the Chief Executive Officer and Chief Financial Officer, concluded that the Company's disclosure controls and procedures were effective. The SOX certifications included in the 10-Q stated that the filing "fairly presents, in all material respects. The financial condition and results of operations of the Company" and that Luciano and Young had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

95. On July 29, 2020, the Company issued a press release announcing its second quarter 2020 financial results. This release reported that the Nutrition segment's operating profit for the quarter was $158 million. On the next day, July 30, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for second quarter ended June 30, 2020. This 10-Q was signed by Defendant Young and included signed SOX certifications from Defendants Lucian and Young. This 10-Q reiterated that Nutrition segment operating profit was $158 million in the quarter and contained the same statements from the prior quarter regarding "market" rates for

"intersegment sales" and compliance with GAAP. Moreover, the 10-Q made the same representations regarding the effectiveness of ADM's internal disclosure controls.

96. The 10-Q also included a section entitled "Analysis of Statements of Earnings," which included an analysis of results for second quarter of 2020 relative to the second quarter of 2019. In the section concerning "[s]egment operating profit," the 10-Q reported that "Nutrition operating profit increased 35%," and cited factors such as "flavors continued to deliver sold results on good sales mix and margin expansion in North America," rising customer demand for plant-based proteins and edible beans drove higher results in Specialty Ingredients," "Health & Wellness delivered higher performance on strong sales for probiotics, improved volumes and margins in fiber, and additional fermentation income," and Animal Nutrition was higher year-over-year on continued execution on Neovia synergies, robust demand for pet food and treats, and improvement in amino acids drove improved results."

97. Also on July 30, 2020, the Company hosted an earnings call with investors and during the call, Defendant Young stated:

> ***Our Nutrition business continued to deliver significant growth, with 35% year-over-year profit improvement for the quarter.*** Over the first half of the year, adjusted profit for Nutrition is up more than 50%. And despite some COVID-19 impacts, revenue is up about 8% on a constant currency basis, with growth spread across the entire broad portfolio. Human Nutrition results were substantially higher in the second quarter of 2020 versus the second quarter of 2019.

98. On the same call, in response to an analyst's question about Nutrition's role "as a contributor to the overall company over the long run[,]" Defendant Luciano stated:

> Yes. Strategically, Eric, I always have -- we always have 2 north, if you will. One is we want to get to the 10% ROIC. And the second is we saw the opportunity to bring growth into the company with extending our value chain into Nutrition. ***And we always say, you heard me saying, we think that that's a business that could get easily to 25%, 30% of our profits, and it continues to move into that. And to be honest, it's moving probably accelerated -- has accelerated into that number.***

> So we might revisit that number. So we don't have a specific number. But all I wanted to express at that point in time is it will be a meaningful contributor because we saw the opportunity. We saw the potential for that business. And now I think that everybody else is realizing.

99. In addition, to touting the future of the Nutrition segment as being beyond management's prior expectations, Defendant Luciano also artfully explained away the early failures, as follows:

> ***At the beginning, we were in an investment phase. So to a certain degree, some of that performance was masked. But now we're looking at what we are doing in -- look at WFSI. WFSI grew 27%. Of course, Animal Nutrition grew much more than that. And when we look at all the microbiome potential there, that's an incredible accelerator that is still very small.*** So I think I answered all before to Ken. You have to remember, ***this is at the beginnings of what we can uncover in terms of profitability.*** We are just delivering while we are building the business. ***But there is much more that will come from Nutrition. And I think that if our track record serves us in giving you confidence, trust us, much more is coming from Nutrition.***

100. Then, on October 29, 2020, the Company issued a press release announcing the third quarter 2020 financial results. The release reported operating profit of $147 in the third quarter for the Nutrition segment. On the next day, October 30, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2020. This 10-Q was signed by Defendant Young and included signed SOX certifications from Defendants Luciano and Young. This 10-Q reiterated that Nutrition segment operating profit was $147 million in the quarter and contained the same statements from the prior quarter regarding "market" rates for "intersegment sales" and compliance with GAAP. Moreover, the 10-Q also made the same representations as the prior quarter with respect to the effectiveness of ADM's internal disclosure controls.

101. The 10-Q also included a section entitled "Analysis of Statements of Earnings," which included an analysis of results for third quarter of 2020 relative to the third quarter of

2019. In the section concerning "[s]egment operating profit," the 10-Q reported that "Nutrition operating profit increased 25%," and cited factors such as "[f]lavors delivered another exceptional quarter, driven by increased revenue globally and improved mix and margins," "[s]ales growth in probiotics and enzymes, along with income from fermentation, contributed to strong results in Health & Wellness," and "delivery of Neovia synergies, strength in livestock feed, and year-over-year improvements in amino acids."

102. Also on October 30, 2020, the Company held an earnings call with investors and analysts to discuss the third quarter 2020 financial results. During the call, Defendant Macciocchi touted that with respect to the Nutrition segment, "[i]f you look on a year-to-date basis through 3 quarters, we're at $448 million, whereas we did $419 million all of last year." In response to an analyst's query regarding the Nutrition segment's path to $1 billion in Nutrition operating profit, Defendant Luciano clarified that the number excludes "any major M&A" and was strictly "organic growth and bolt on." Defendant Macciocchi added that "what we've done is we've really taken the approach of let's grow organically."

103. On November 19, 2020, Defendant Luciano participated in the Stephens NASH Investment Conference during which he touted the Nutrition segment's ability acquire raw materials through intersegment sales as a "key competitive advantage." Defendant Luciano elaborated that the Nutrition segment "takes on all that operational excellence and all that low cost to come to the market being more efficient than anybody else" and "there are incredible number of synergies that are a little bit like an iceberg, most of them underwater and not seen."

104. On December 9, 2020, Defendant Young participated in the BMO Capital Markets Boston Growth Conference – Fireside Chat. During the conference, Defendant Young was asked about ADM's ability to sustain operations to counter the fluctuations in commodities

and responded that: "we've actually grown the Nutrition business, whereby now it's a significant contributor. And it's actually, very, very robust earnings, right, very predictable, robust earnings." Defendant Young also cited "organic growth and bolt-on acquisitions" as the path to $1 billion in operating profit for the Nutrition segment.

105. On January 26, 2021, the Company issued a press release regarding its full year 2020 results. This release announced that the Nutrition segment's operating profit was $574 million for the 2020 full fiscal year. Further, Defendant Luciano was quoted in the release as touting that "[o]ur Nutrition business continued to harvest investment, lead in consumer growth trend areas and partner with customers to deliver new products and solutions in 2020, driving 37 percent annual operating profit growth."

106. On that same date, Defendants Luciano and Young participated in an earnings call with investors and analysts, during which Defendant Young reiterated that Nutrition's results were $574 million. Further, Defendant Luciano emphasized that "the Nutrition business … [is] a business that [has] a ***strong organic growth program***."

107. Weeks later, on February 18, 2021, the Company filed its Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Luciano, Young, Burke, Crews, Dufour, Felsinger, Harrison, Moore, Sanchez, Sandler, Schlitz, and Westbrook. The 2020 10-K also contained SOX certifications signed by Defendants Luciano and Young.

108. In the 2020 10-K, Defendants Luciano and Young stated "Nutrition revenues increased 2% to $5.8 billion due to higher sales prices ($0.1 billion)." Defendants Luciano and Young further stated:

> ***Nutrition operating profit increased 37%. Human Nutrition delivered strong performance and growth across its broad portfolio***. Strong execution to meet rising customer demand for plant-based proteins and edible beans drove higher results in Specialty Ingredients. Additional income from fermentation and strong sales for probiotics and fiber drove higher performance in Health & Wellness. Flavors continued to deliver strong results. ***Animal Nutrition results improved year-over-year driven by strong performance from Neovia, good margins in commercial and livestock premix, and improved margins in amino acids.***

109. Further, 2020 10-K contained the same statements regarding market rates being utilized in intersegment sales as in the prior Forms 10-Q filed in 2020 and once again reiterated that the Nutrition operating profit for the full fiscal year 220 was $574 million. Further, the 2020 10-K also represented that the Company's consolidated financial statements were in compliance with GAAP. The 2020 10-K also stated that the Company's "growth strategy … encompasses organic and inorganic initiatives" and it is executed "through both organic and inorganic growth."

110. The 2020 10-K also included a section entitled "Analysis of Statements of Earnings," which included discussion concerning "[s]egment operating profit." Therein, the 2020 10-K represented that "Nutrition operating profit increased 37%," and cited factors such as "[s]trong execution to meet rising consumer demand for plant-based proteins and edible beans[,]" "[a]dditional income from fermentation and strong sales for probiotics and fiber[,]" and "strong performance from Neovia, good margins in commercial and livestock premix, and improved margins in amino acids.

111. Further, the 2020 10-K made the same representations with respect to the effectiveness of the Company's internal controls as in prior quarters and, additionally, represented that the Company "internal control system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial

statements in accordance with [GAAP]," and that ADM's "internal control over financial reporting was effective as of December 31, 2020."

112. On March 26, 2021, the Company filed its proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Burke, Crews, Dufour, Felsinger, Harrison, Luciano, Sanchez, Moore, Sandler, Schlitz and Westbrook solicited the 2021 Proxy Statement, which contained material misstatements and omissions.

113. The 2021 Proxy Statement called for Company shareholders to: (a) reelect Defendants Burke, Crews, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to serve as directors of the Board; (b) to elect Defendant Colbert as a director of the Board (c) ratify Ernst & Young LLP as the Company's registered public accounting firm; and (d) approve, on an advisory basis, the compensation of named executive officers.

114. The 2021 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> [O]ur company's Board of Directors is responsible for risk oversight, focusing on our company's overall risk management strategy, our company's degree of tolerance for risk, and the steps management is taking to manage our company's risk… The Audit Committee currently maintains responsibility for overseeing our company's enterprise risk management process and regularly discusses our company's major risk exposures, the steps management has taken to monitor and control such exposures, and guidelines and policies to govern our company's risk assessment and risk management processes.

115. On April 27, 2021, ADM issued a press release announcing its first quarter 2021 financial results. The release revealed that the Nutrition segment posted operating profit of $154 million in the first quarter of 2021. On the next day, April 28, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2021. This 10-Q was signed by Defendant Young and included signed SOX certifications from Defendants Luciano

and Young. Further, the 10-Q reiterated the same statements from prior quarters regarding market rates being used in intersegment sales and compliance with GAAP. Further, the 10-Q also reiterated that the Nutrition segment's operating profit was $154 million in the quarter. Moreover, the 10-Q also made the same representations as the prior quarter with respect to the effectiveness of ADM's internal disclosure controls.

116. The 10-Q also included the "Analysis of Statements of Earnings" section, which included a discussion regarding "[s]egment operating profit," and therein, the 10-Q reported that "Nutrition operating profit increased 8%," and cited factors such as "Flavor results were up, driven by strong sales across various market segments, especially beverages," "[f]avorable product mix in North America, improved margins in EMEAI, and accelerated income from a customer agreement[,]" "robust demand driving higher results in bioactives and fibers," and "Animal Nutrition results were lower … partially offset by favorable results in amino acids, driven by improved product mix."

117. On June 7, 2021, Defendant Macciocchi participated in the Deutsche Bank dbAccess Global Consumer Conference and during which he reiterated that the Nutrition segment's "2020 results [were] $574 million in operating profit" and touted Nutrition as a "very good organic growth story." When questioned about the Company's goal of $1 billion in operating profit for Nutrition by 2024, Defendant Macciocchi replied that "our flavor and natural color business [has] margins that are very much aligned in the 20% range for EBITDA margin perspective," "[a]lternative protein margins are quite strong," "Health and Wellness products, the margins are quite strong," and that there was opportunity "to margin up this business [on] the animal side" which is "really about this mix shift in this transformation and making sure we margin up this business."

118. Then, on July 27, 2021, the Company issued a press release reporting second quarter 2021 financial results. This release announced that the Nutrition segment posted an operating profit of $201 million in the second quarter of 2021. On the same date, ADM filed its quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2021. This 10-Q was signed by Defendant Young and included signed SOX certifications from Defendants Luciano and Young. This 10-Q reiterated the same statements from prior quarters regarding market rates being used in intersegment sales and compliance with GAAP. Further, the 10-Q also reiterated that the Nutrition segment's operating profit was $201 million in the quarter.

119. In the "Analysis of Statements of Earnings," the 10-Q discussed "[s]egment operating profit," and reported that "Nutrition operating profit increased 27%," and cited factors such as "the flavors business delivered strong volumes and improved product mix, particularly in the beverage segment," "strong sales growth in specialty proteins," and "improved demand and margins in amino acids, strength in feed additives and ingredients and better performance in EMEA."

120. On September 9, 2021, Defendant Luthar attended and participated in the Barclays Global Consumer Staples Conference, during which he represented that ADM was "driving synergies across the various businesses that Nutrition is capitalized on, to drive earnings growth from about $250 million in operating profit in Nutrition to what we would anticipate close to $700 million this year, a significant growth."

121. On October 26, 2021, ADM issued a press release announcing third quarter 2021 financial results. The release reported that the Nutrition segment achieved $176 million in operating profit during the quarter. On the same date, ADM filed its quarterly report for the quarter ended September 30, 2021, on Form 10-Q with the SEC. The 10-Q was signed by

Defendant Young and included SOX certifications from Defendants Luciano and Young. This 10-Q reiterated the same statements from Prior quarters regarding market rates being used in intersegment sales and compliance with GAAP. Further, the 10-Q also reiterated that the Nutrition segment's operating profit was $176 million in the quarter.

122. In the "Analysis of Statements of Earnings" section, the 10-Q discussed "segment operating profit" and reported that "Nutrition operating profit increased 20%" and cited the following contributing factors to the Nutrition segment's operating profits: "[h]igher volume and improved product mix, with particular strength in beverage," "strong demand for alternative proteins," "robust sales growth in bioactives and fiber," and "strength in amino acids as well as feed additives and ingredients."

123. In an earnings call, also on October 26, 2021, Defendant Young stated that "the Nutrition business remains on its solid growth trajectory with 17% higher revenues and 15% on a constant currency basis and 20% higher profits year-over-year and continued strong EBITDA margins." Defendant Young further stated that: "Looking ahead, ***we expect Nutrition to continue on its impressive growth path, with strength across the Human and Animal Nutrition leading to strong year-over-year earnings expansion in the fourth quarter and a 20% full year growth versus 2020.***." Defendant Luciano affirmed Nutrition's growth, stating: "***Nutrition will continue on its strong growth trajectory***, in line with our 15% per annum trend rate goals and on its way to $1 billion in operating profit in the coming years."

124. On December 10, 2021, Defendants Luciano, Young, Luthar, and Macciocchi attended and participated in ADM's "Global Investor Day" presentations, during which they announced an increased goal of achieving Nutrition operating profit of "$1.25 billion to $1.5 billion" by 2025. During the conference, Defendant Young stated attributed the Nutrition

segment growth to "M&A and organic growth" and that "as every year ticks by, going from '21 to '22, '23 Nutrition is growing [with] a very stable earnings base." Defendant Macciocchi reinforced that management was "focused on our organic growth" and represented that the flavors business "operates an EBITDA margin range of 20% to 25%," the specialty ingredients business "plays in the EBITDA margin range of 20% to 25%," the Health and Wellness business "operates at the very top of the range at 25-plus percent margins," and that there "significant opportunities to up margin [in the Animal Nutrition] portfolio."

125. On January 25, 2022, ADM issued a press release regarding its full year 2021 financial results. The release announced that the Nutrition segment achieved operating profit of $691 million and Animal Nutrition operating profit of $154 million in the 2021 full fiscal year. On that same date, Defendants Luciano and Young participated in an earnings call with investors and analysts during which Defendant Luciano touted the Nutrition segment's "industry-leading revenue and OP growth" and full year OP of $691 million, representing a 20% year-over-year increase."

126. On February 17, 2022, the Company filed its Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Luciano, Young, Burke, Colbert, Crews, Dufour, Felsinger, Harrison, Moore, Sanchez, Sandler, Schlitz, and Westbrook. The 2021 10-K also contained SOX certifications signed by Defendants Luciano and Young.

127. In the 2021 10-K, Defendants Luciano, and Young stated: "Nutrition revenues increased 16% to $6.7 billion due to higher sales prices ($1.0 billion), partially offset by lower sales volumes of ($0.1 billion)." They further represented:

> ***Nutrition operating profit increased 20%. Human Nutrition results were higher than the prior year. Flavors results were up, driven by strong sales across various market segments. In North America and EMEAI, the flavors business delivered strong volumes and improved product mix, particularly in the beverage segment. Specialty Ingredients delivered sales growth in specialty proteins and improved pricing and product mix,*** though results were negatively impacted by the effects of higher production costs, normalization of prices in the wholesale ingredients business, and COVID-related shifts in demand across the portfolio. ***Health and Wellness results were strong, with robust demand driving strong results in probiotics and fibers. Animal Nutrition results were higher on favorable results in amino acids, driven by improved margins and product mix, partially offset by lower demand and higher input costs as a result of pandemic effects in South America and Asia.***

128. The 2021 10-K also reiterated the same statements regarding the use of market rates in intersegment sales and reaffirmed that ADM's financial statements were prepared in compliance with GAAP. Further, the 2021 10-K echoed the press release and statements during the earnings call, reporting that the Nutrition segment's operating profit of $691 million, Animal Nutrition's operating profit of $154 and the overall Nutrition segment's operating profit increase of 20% in full year 2021. The 2021 10-K contained the same statements regarding market rates being utilized in intersegment sales as in the prior Forms 10-Q filed in 2021. Further, the 2021 10-K also represented that the Company's consolidated financial statements were in compliance with GAAP. The 2021 10-K also echoed the 2020 10-K with respect to statements on the Company's growth initiatives.

129. Additionally, the 2021 10-K included a section entitled "Analysis of Statements of Earnings," which included discussion concerning "[s]egment operating profit." Therein, the 2021 10-K represented that "Nutrition operating profit increased 20%," and cited factors such as "the flavors business delivered strong volumes and improved product mix, particularly in the beverage segment," "sales growth in specialty proteins and improved pricing and product mix,"

"robust demand driving strong result in probiotics and fibers," and "favorable results in amino acids, driven by improved margins and product mix."

130. Further, the 2021 10-K made the same representations with respect to the effectiveness of the Company's internal controls as in prior quarters and, additionally, represented that the Company "internal control system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with [GAAP]," and that ADM's "internal control over financial reporting was effective as of December 31, 2021.

131. On March 22, 2022, the Company filed its proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Burke, Colbert, Crews, Dufour, Felsinger, Harrison, Luciano, Sanchez, Moore, Sandler, Schlitz and Westbrook solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

132. The 2022 Proxy Statement called for Company shareholders to: (a) reelect Defendants Burke, Crews, Colbert, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to serve as directors of the Board; (b) ratify Ernst & Young LLP as the Company's registered public accounting firm; and (c) approve, on an advisory basis, the compensation of named executive officers.

133. The 2022 Proxy Statement also stated that: (i) Nutrition "grew … operating profit by 20% year-over-year" in 2021 versus 2020"; (ii) Macciocchi "[g]rew full-year Nutrition operating profits by over 20% over 2020"; and (iii) the Company "[a]chiev[ed] a >15% year-over-year increase in Nutrition adjusted operating profit."

134. The 2022 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> [O]ur company's Board of Directors is responsible for risk oversight, focusing on our company's overall risk management strategy, our company's degree of tolerance for risk, and the steps management is taking to manage our company's risk… The Audit Committee currently maintains responsibility for overseeing our company's enterprise risk management process and regularly discusses our company's major risk exposures, the steps management has taken to monitor and control such exposures, and guidelines and policies to govern our company's risk assessment and risk management processes. The Audit Committee periodically reports to the Board of Directors regarding significant matters identified with respect to the foregoing.

135. On April 26, 2022, ADM issued a press release regarding its first quarter 2022 financial results. The release reported that the Nutrition segment achieved operating profit of $189 million in the first quarter of 2022. On the same date, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter ended March 31, 2022. The 10-Q was signed by Defendant Luthar and included signed SOX certification from Luciano and Luthar. This 10-Q reiterated the same statements from prior quarters regarding market rates being used in intersegment sales and compliance with GAAP. Further, the 10-Q also reiterated that the Nutrition segment's operating profit was $189 million in the quarter. Moreover, the 10-Q also made the same representations as the prior quarter with respect to the effectiveness of ADM's internal disclosure controls.

136. In the "Analysis of Statements of Earnings" section, the 10-Q discussed "segment operating profit" and reported that "Nutrition operating profit increased 23%" and cited the following contributing factors to the Nutrition segment's operating profits: "strong sales growth in alternative proteins, including contribution from the Sojaprotein acquisition, and positive currency timing impacts in South America," "probiotics … and robust demand for fibers," and as to Animal Nutrition, "strength in amino acids."

137. On that same day, ADM hosted an earning call attended by Defendants Lucian, Young, and Luthar. During the call, Defendant Luthar stated the following:

> The reason our profits [in Nutrition] were stronger than what we had guided in Q4 were threefold. One is, we did not expect some upfront costs that we cited, and we had anticipated inflationary cost pressure and supply disruptions. However, with ***the smart pricing and active supply chain collaboration with our AS&O Carb Solutions teams, we manage these very well across all the Nutrition businesses.***

138. On July 26, 2022, ADM issued a press release regarding its second quarter 2022 financial results. The release announced that the Nutrition segment achieved operating profit of $239 million in the second quarter of 2022. On that same date, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter ended June 30, 2022. This 10-Q reiterated the same statements from prior quarters regarding market rates being used in intersegment sales and compliance with GAAP. Further, the 10-Q also reiterated that the Nutrition segment's operating profit was $239 million in the quarter.

139. In the "Analysis of Statements of Earnings" section, the 10-Q discussed "segment operating profit" and reported that "Nutrition operating profit increased 19%" and cited the following contributing factors to the Nutrition segment's operating profits: "demand for alternative proteins resulted in strong soy protein volumes and margins, as contributions from the Sojaprotein acquisition," "good demand from texturants," [s]trength across probiotics, including … [and] robust demand for fibers," and as to Animal Nutrition, "continued strong volumes and margins in amino acids.

140. On October 25, 2022, ADM issued a press release regarding its third quarter 2022 financial results. The release announced that the Nutrition segment posted an operating profit of $177 million in the third quarter. On that same date, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter ended September 30, 2022. This 10-Q was signed

by Defendant Luthar and included signed SOX certifications from Defendants Luciano and Luthar. This 10-Q reiterated the same statements from prior quarters regarding market rates being used in intersegment sales and compliance with GAAP. Further, the 10-Q also reiterated that the Nutrition segment's operating profit was $177 million in the quarter. Moreover, the 10-Q also made the same representations as the prior quarter with respect to the effectiveness of ADM's internal disclosure controls.

141. In the "Analysis of Statements of Earnings" section, the 10-Q discussed "segment operating profit" and reported that "Nutrition operating profit increased 1%" and cited the following contributing factors to the Nutrition segment's operating profits: "strong demand for plant-based proteins, as well as solid performance in texturants," "continued strong [flavors] demand growth in the region," and "strong [pet] volumes and margins in North America."

142. During an earnings call on that same date, October 25, 2022, Defendant Luthar stated "we expect the fourth quarter for Nutrition this year to be higher than the fourth quarter of 2021, ***with continued strong demand in Human Nutrition more than offsetting adverse currency effects. We expect Nutrition's full year OP growth to be between 15% and 20% on a constant currency basis***." In response to an analyst's question about ongoing momentum for 2023, Defendant Luciano stated:

> We see, as Vikram expressed before, a positive outlook for starches and sweeteners. We have finished some of our contracting, and we see the volume and we see the margins holding or slightly expanding there. ***And we see a continuation of our growth trajectory in Nutrition. When I talk about the pipeline, that's the business in which we have the biggest visibility into the future because these are projects that -- barring any supply issues, we will bring to the P&L***. So I would say, that is what's -- give us some positive momentum or positive expectations for '23.
>
> And as I explained in the Nutrition question, we have new capacity coming on stream. We have -- we are expanding Biopolis probiotics capacity by a factor of 5.

> We are bringing a new line for plant-based proteins in Sojaprotein. We are expanding our PetDine capacity**. *So we are bringing a lot of new capacity to bear because we have the pipeline to actually transfer them into profits***. So from what we can see here, and again in a very uncertain world, is we have good -- very good momentum going into 2023.

143. On January 26, 2023, ADM issued a press release regarding its full year 2022 financial results. The release announced that the Nutrition segment posted an operating profit of $736 million and that Animal Nutrition posted an operating profit of $170 million in full year 2002.

144. On that same date, January 26, 2023, the Company held an earnings call with investors and analysts, during which Defendant Luciano stated that: "Our nutrition business continued to outpace the industry, with 18% constant currency revenue growth for the full year. We delivered an impressive 26% year-over-year revenue growth in BioSolutions. The portfolio of acquisitions we made in the prior year continued to deliver OP above our financial projections."

145. On the call, an analyst queried management about operating profit growth, to which Defendant Luciano responded:

> [Y]ou've been witnessing how we built this Nutrition business over the years**. *This is a business that, if I take out the last 3 years, it has been growing OP by 20%,*** CAGR, if you will. So it's a business that we continue to add layers of capabilities so we can continue to win at the customer front, whether it's we go from individual ingredients to systems, where we bring functionality to those systems through bioactives, whether we bring sustainability benefits to that through our decarbonization or Regen Ag.
>
> So we continue to add layers to continue to help customers excel at the consumer level. And we see that in our win rates, and we see that in our pipeline. ***So we have visibility into that.*** As Vikram said, maybe some of the categories soften a little bit, ***but our ability to gain share, to win faster than those categories has been demonstrated. I think this year, we grew revenue significantly higher than the market. So when we look forward, as I said in my -- I think one of the earlier answers, we continue to expect bolt-on and M&A -- bolt-on M&A and***

> ***organic growth.*** We had 4 companies in 2021. ***We're building capabilities and new capacity in 2022 that we're going to see onstream in '23, and we're going to continue to grow that.***

146. Defendant Luciano would also state on the call that:

> [The Nutrition] business has been a very successful story at the customer level for many, many years. We continue to drive higher growth rates than the industry we participate in. So that has not changed, the robust pipeline growth's there, and ***we have achieved all that***, Ben, ***through a very disciplined strategy of bolt-on acquisitions and organic growth.***"

147. On February 14, 2023, the Company filed its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Luciano, Luthar, Burke, Colbert, Collins, Crews, Felsinger, Harrison, Moore, Sanchez, Sandler, Schlitz, and Westbrook. The 2022 10-K also contained SOX certifications signed by Defendants Luciano and Luthar. The 2022 10-K also echoed the 2020 10-K with respect to statements on the Company's growth initiatives.

148. Additionally, the 2022 10-K included a section entitled "Analysis of Statements of Earnings," which included discussion concerning "[s]egment operating profit." Therein, the 2022 10-K represented that "Nutrition operating profit increased 7%," and cited factors such as "strong sale growth in alternative proteins [and] good demand for texturants," "probiotics [and] robust demand for fiber and Vitamin E," and "Animal Nutrition profits higher than the prior year due primarily to strength in amino acids."

149. Further, the 2022 10-K made the same representations with respect to the effectiveness of the Company's internal controls as in prior quarters and, additionally, represented that the Company "internal control system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial

statements in accordance with [GAAP]," and that ADM's "internal control over financial reporting was effective as of December 31, 2022."

150. In the 2022 10-K, Defendants Luciano and Luthar stated, "Nutrition revenues increased 14% to $7.6 billion due to higher sales prices ($0.2 billion) and higher sales volumes ($0.7 billion)." They further stated:

> ***Nutrition operating profit increased 7%. Human Nutrition delivered higher year- over-year results.*** Flavors results were lower driven by demand fulfillment challenges, the impact of the strong U.S. dollar in EMEA, softer demand in Asia Pacific, and higher costs in North America. Strong sales growth in alternative proteins, including contribution from the Sojaprotein acquisition, and good demand for texturants offset some higher operating costs to help deliver better year-over- year results in Specialty Ingredients. Health and Wellness was also higher year- over-year, powered by probiotics, including the contribution from the November 2021 Deerland Probiotics and Enzymes acquisition, and robust demand for fiber and Vitamin E. ***Animal Nutrition profits were higher than the prior year due primarily to strength in amino acids.***

151. The 2022 10-K also reiterated the same statements regarding the use of market rates in intersegment sales and reaffirmed that ADM's financial statements were prepared in compliance with GAAP. Further, the 2022 10-K echoed the press release and statements during the earnings call, reporting that the Nutrition segment's operating profit of $736 million, and Animal Nutrition's operating profit of $170 million.

152. On March 14, 2023, the Company filed its proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Burke, Colbert, Collins, Crews, Felsinger, Harrison, Luciano, Sanchez, Moore, Sandler, Schlitz and Westbrook solicited the 2023 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

153. The 2023 Proxy Statement called for Company shareholders to, *inter alia*: (1) re-elect Defendants Burke, Colbert, Collins, Crews, Harrison, Luciano, Moore, Sandler, Schlitz,

and Westbrook to serve as directors of the Board; (2) elect Defendant de Brabander to the Board; (3) ratify Ernst & Young LLP as the Company's registered public accounting firm; and (4) approve, on an advisory basis, the compensation of named executive officers.

154. The 2023 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> [O]ur company's Board of Directors is responsible for risk oversight, focusing on our company's overall risk management strategy, our Company's degree of tolerance for risk, and the steps management is taking to manage and mitigate our company's risk… The Audit Committee currently maintains responsibility for overseeing our Company's enterprise risk management process and regularly discusses our Company's major risk exposures, the steps management has taken to monitor and control such exposures, and guidelines and policies to govern our Company's risk assessment and risk management processes. The Audit Committee periodically reports to the Board of Directors regarding significant matters identified with respect to the foregoing.

155. On April 25, 2023, ADM issued a press release regarding the first quarter 2023 results. The release announced that the Nutrition segment posted operating profit of $145 million in the first quarter of 2023. On the same date, the Company filed its quarterly report on Form-10Q for the first quarter ended March 31, 2023, with the SEC. This 10-Q was signed by Defendant Luthar and included signed SOX certifications from Defendants Luciano and Luthar. This 10-Q reiterated the same statements from prior quarters regarding market rates being used in intersegment sales and compliance with GAAP. Further, the 10-Q also reiterated that the Nutrition segment's operating profit was $145 million in the quarter.

156. In an earnings call on April 25, 2023, Defendant Luciano continued to promote the Company's growth in Nutrition, stating that "***Nutrition's growth trajectory for the year remains on course with a double-digit increase in our human Nutrition pipeline compared to this point in 2022***." In response to an analyst's question about Nutrition's profits for the year,

Defendant Luthar stated: "***In Human Nutrition, as we mentioned, we've got a strong pipeline***." He attributed an expected slowdown in the first half of the year to Animal Nutrition, but assured investors that "we feel good about Animal Nutrition from a turnaround perspective […] we feel strong and good about the 10% plus constant currency OP growth in Nutrition for 2023."

157. On July 25, 2023, ADM issued a press release regarding the second quarter 2023 results. The release announced that the Nutrition segment posted operating profit of $185 million in the second quarter of 2023. On the same date, the Company filed its quarterly report on Form-10Q for the second quarter ended June 30, 2023, with the SEC. This 10-Q was signed by Defendant Luthar and included signed SOX certifications from Defendants Luciano and Luthar. This 10-Q reiterated the same statements from prior quarters regarding market rates being used in intersegment sales and compliance with GAAP. Further, the 10-Q also reiterated that the Nutrition segment's operating profit was $145 million in the quarter.

158. In an earnings call on July 25, 2023, Defendant Luciano stated: "***In Nutrition, our unique go-to-market strategy continues to drive a larger sales pipeline and deliver double-digit growth in the Flavors business***[.]" Defendant Luthar reaffirmed the growth of Nutrition, stating:

> ***When looking at Nutrition as a whole, we now expect 2023 results to be similar to the prior years as we expect growth in Human Nutrition to be offset by lower results in Animal Nutrition.*** However, given the increase in customer innovation we've seen in our Flavors business and our recent wins in pipeline growth across Human Nutrition, as well as the actions we are taking in Animal Nutrition, we remain confident about the future outlook and growth prospects for Nutrition.

159. Defendant Luthar also promoted the Company's progress in Flavors in response to an analyst question about the Nutrition segment, stating:

> Flavors. Strong pipeline and win rates. We talked about the largest ever pipeline we've had. Flavors actually grew profits in the first half 9%, 20% in Q2. So that's a very good sign of the recovery we are seeing in parts of the Human Nutrition business. ***The other thing that's important to note, Flavors actually contributed***

> ***almost 50% of the overall operating profit for Nutrition in the first half. So that's an important signal as you think about the future growth of Nutrition***. Yes, that was primarily driven in the beverage category, but we see green shoots of opportunity in the food category as well.

160. In response to an analyst question about "the pathway '24, '25 and kind of the achievability of the prior 2025 target, I believe, $1.2 billion of OP in that [Nutrition] segment[,]" Defendant Luciano stated in pertinent part:

> ***In the Human Nutrition, margins are much higher and is [sic] continue to make it better and more stickier to customers as we develop better solutions. In Animal Nutrition was a margin up story since they were coming from lower margins. So when you think about our numbers are a combination of applying our growing faster than market and our EBITDA margin on sales to a market number.*** Of course, this industry, as you can see by ourselves and our competitors is having through tough times, whether it is because customers are either not innovating fast enough or destocking at this point in time and making sure they have their supply chains in order.
>
> ***So to the extent that those projections are going to be reduced, our percentages of applied to those numbers will be a smaller number. So we haven't gone through that because, to be honest, we are looking at how do we address our current challenges. So we're not that worried about 2025 right now, we want to make sure we make all the adjustments that we need to make.*** And maybe as we talk about the adjustment, let me talk a little bit about Animal Nutrition. Animal Nutrition, as we become more into the business, if you will. We know there is a commodity part, and there is a specialty part. The specialty part matches very well with the -- what the playbook that we have in the human side. And that part is growing and we will continue to accelerate. And Vikram said before, we are repurposing resources to add more of that.

161. On October 24, 2023, ADM issued a press release regarding the third quarter 2023 results. The release announced that the Nutrition segment posted operating profit of $138 million in the third quarter of 2023 and $468 million in the first nine months 2023. The release also announced that Animal Nutrition posted an operating profit of $28 million in the first nine months of 2023. On the same date, the Company filed its quarterly report on Form-10Q for the third quarter ended September 30, 2023, with the SEC. This 10-Q was signed by Defendant

Luthar and included signed SOX certifications from Defendants Luciano and Luthar. This 10-Q reiterated the same statements from prior quarters regarding market rates being used in intersegment sales and compliance with GAAP. Further, the 10-Q also reiterated that the Nutrition segment's operating profit was $138 million in the quarter, $469 million in the first nine months of 2023, and that Animal Nutrition's operating profit was $28 million in the first nine months of 2023.

162. In an earnings call on October 24, 2023, Defendant Luthar stated:

> The plant-based protein market has been experiencing destocking and consumer demand softness over the course of the year that will likely persist into next year. Given these recent market dynamics, we have re-scoped our Decatur protein modernization investment project to better match the expected lower growth demand environment. Also, we are leveraging our expertise in creation, design and development to differentiate our product offerings to serve evolving consumer needs. ***These adjustments will enable a faster pivot to higher growth and more resilient categories such as specialized nutrition, which have synergies across the Nutrition portfolio, and we are rapidly building this revenue pipeline.***
>
> Health and Wellness results were higher year-over-year due to double-digit biotech sales and a favorable impact related to the revised commercial agreement with Spiber. ***During the quarter, we realized a significant expansion in our revenue pipeline reinforcing the demand for evidence-based solutions.***
>
> In Animal Nutrition, we are beginning to see the cost optimization actions and the expansion of offerings in the specialty feed and ingredient space from earlier this year, driving improved performance. However, the recovery in the base business was more than offset by normalized year-over-year amino acids margins as well as lower profit contribution from the Pet Solutions business.
>
> Looking forward, we anticipate Flavors to finish the year strong driven by growth in EMEA and North America. Health and Wellness operating profit is expected to finish similar to last year. Animal Nutrition operating profit is expected to continue to recover sequentially quarter-over-quarter. Specialty Ingredients operating profit is expected to be down significantly, impacted by the recent Decatur East incident and demand softness.

> ***All in, we now expect full year 2023 operating profit for Nutrition to be around $600 million. While our results in 2023 have been below our expectations, we expect Nutrition to return to growth in 2024.***
>
> ***We will continue to build on the Flavors momentum from 2023. Health and Wellness should maintain its steady performance. The cost actions in the shopper pivot to higher-margin products will enable Animal Nutrition to drive growth, further reinforced by improved go-to-market capabilities.***

163. Defendant Luthar then announced a raised 2023 earnings outlook, stating: "Even with the softness in Nutrition, and lower-than-expected profit contributions from Wilmar, we are raising our 2023 earnings outlook again and now anticipate full year EPS in excess of $7 per share." Defendant Luciano affirmed:

> ***For Nutrition, we expect continued growth in our revenue opportunity pipeline with significant conversions continuing as we move past some near-term demand weakness.*** Our expanding results in Flavors continue to signal acceleration across our broader portfolio. We expect the positive revenue growth trends in Health and Wellness to drive into next year, and we're already pivoting Specialty Ingredients towards high potential areas like alternative daily and specialized nutrition.

164. The statements referenced above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's Nutrition segment and accounting practices, which were known to the Individual Defendants or recklessly disregarded by them as follows: (a) that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate impression of the Company's performance and future prospects, including reported operating profits; (b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to the Company's business; (c) that the Nutrition segment's results were not being positively impacted by small components of the business, but mostly a product of an undisclosed six-year accounting scheme to boost profits by recording intersegment sales to Nutrition at below

market rates; (d) the Nutrition segment's operating profit and results were overstated as a result such scheme; (e) in executing the scheme, the Company and Individual Defendants were violating ADM's policy and GAAP by failing to execute intersegment transactions involving Nutrition at market rates; (f) as a result, the Company's internal controls for disclosure and financial reporting not effective and the Individual Defendants had failed to implement and/or maintain adequate internal controls; and (g) that, based on the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company's Nutrition segment and related financial results, growth, and prospects.

## THE TRUTH EMERGES

165. On January 21, 2024, the Company announced that it had placed its CFO Luthar on leave effective immediately. The Company stated that Defendant Luthar's "leave is pending an ongoing investigation being conducted by outside counsel for ADM and the Board's Audit Committee regarding certain accounting practices and procedures with respect to ADM's Nutrition segment, including as related to certain inter-segment transactions." The Company also announced that its investigation was initiated in response to its receipt of a voluntary document request by the SEC. As a result, the Company delayed its Q4 and FY 2023 earnings release and withdrew its outlook for the Nutrition segment.

166. On this news, the Company's common stock dropped by $16.23 per share, or approximately 24%, from $68.19 per share to close at $51.69 on January 22, 2024. This one-day decline represented the largest single-day percentage decline in ADM stock since 1929.

167. Analyst reaction echoed investor sentiment. For example, a UBS Research analyst downgraded the stock to a "Neutral" rating citing: "[n]o growth in Nutrition" and noting that "[w]e think investors will have a tough time getting confident about the Nutrition segment

growth story any time soon." Barclays downgraded ADM to "underweight" from "overweight," slashed the price target to $60.00 from $95.00, and commented that "an overall stringent buyer does not draw up better expectations for [the Nutrition] segment, in our perspective." Jeffries also cut its price target from $82.00 down to $70.00 primarily due to the "uncertainty around the Nutrition segment[.]"

168. On February 5, 2024, *Bloomberg* reported that the DOJ had launched an investigation into ADM's accounting scheme, as follows, in pertinent part:

> The US Attorney's Office in Manhattan has launched an investigation into the accounting practices at Archer-Daniels-Midland Co., according to people with direct knowledge of the matter.
>
> The probe is focused on the company's nutrition business, said the people, who asked not to be named discussing confidential information.
>
> ADM shook the commodity world last month after it suspended Chief Financial Officer Vikram Luthar and cut its earnings outlook pending an inquiry into its accounting practices prompted by the US Securities and Exchange Commission.

169. On the same day, *Reuters* also reported on the DOJ investigation, stating that: "[t]he U.S. Justice Department is probing accounting practices at [ADM], according to two people with direct knowledge of the matter, ramping up pressure on the global commodities giant." According to Reuters, "[t]he sources each said a SDNY [Southern District of New York] prosecutor asked about the company's pricing practices related to the sales of goods from ADM's commodities units to its Nutrition division."

170. Around the time that the DOJ investigation was launching its investigation, Defendant Young suddenly resigned from the boards of directors of three publicly-traded companies – Hormel Foods Corp., ("Hormel") Marsh & McLennan, ("M&M") and International

Paper. In doing so, Defendant Young forfeited hundreds of thousands of dollars in total compensation.

171. On February 2, 2024, in an SEC filing, Hormel announced that "[o]n February 1, 2024, Raymond G. Young resigned from the Hormel Foods Corporation Board of Directors, effective immediately." Young's resignation occurred just one day after he was re-elected to the Hormel board of directors for another term.

172. On February 9, 2024, M&M reported that Defendant Young did not intend to stand for re-election to the Board. On February 16, 2024, International Paper announced that Defendant Young did not intend to seek reelection. Defendant Young received more than $600,000 in total compensation for board service for both companies in 2023.

173. On March 12, 2024, the Company filed its 2023 10-K correcting errors in ADM's prior financial statements, restating historical financial results for Ag Services and Oilseeds, Carb Solutions and Nutrition segments dating back to 2018 and admitting its previously issued filings with the SEC were not prepared in accordance with GAAP (the "Restatement").

174. In the 2023 10-K, ADM admitted that the Individual Defendants' statements throughout the Relevant Period that, "intersegment sales have been recorded at amount approximating market" were false, and that sales between the Nutrition segment and legacy segments were not accurately reported. The filing states the following, in pertinent part:

> The Company has historically disclosed in the footnotes to its financial states that intersegment sales have been recorded at amount approximating market. In connection with the Investigation, the Company identified certain intersegment sales that occurred between the Company's Nutrition reporting segment and the Company's Ag Services and Oilseeds and Carbohydrate Solutions reporting segments that were not recorded at amount approximating market.

175. According to ADM, the errors in the Company's prior filings "generally arise from the measurement of intersegment sales pricing or rebates relating to products sold to the Nutrition reporting segment by the Ag Services and Oilseeds and Carbohydrate Solutions reporting segments."

176. As a result of the accounting fraud scheme, the Individual Defendants inflated Nutrition's fiscal year operating profit by upwards of 10.2% and quarterly operating profit by nearly 25%.

177. Additionally, in the 2023 10-K, the Individual Defendants disclosed that the SEC's "document request" first publicly disclosed on January 21, 2024, was received on June 30, 2023 – nearly seven months prior. Accordingly, despite knowledge of the SEC probe throughout latter half of 2023, the Individual Defendants continued to represent that intersegment sales were executed at market price. The 2023 10-K also revealed that ADM had received multiple "document requests" from the DOJ "focused primarily on the same subject matter as the SEC investigation and that the DOJ had issued grand jury subpoenas to current and former ADM employees.

178. The 2023 10-K also stated that the as a result of the ongoing investigations, the Company was "subject to a number of risks" that "could have material adverse effect on the Company's business, results of operations, financial condition and liquidity" including, but not limited to:

- the Company's Board of Directors and senior management have been required to devote significant time to the Investigation, the correction of certain segment-specific historical financial information and related matters, resulting in potential management distraction from the operation of the business;

- the price of the Company's common stock has declined significantly, has been subject to fluctuations and could continue to fluctuate upon further announcements or actions;

- the Company is facing securities litigation and could face additional litigation under federal and state securities laws or other claims arising from the Investigation, such litigation can be costly to defend, and if decided against the Company, such litigation could require the Company to pay substantial judgments or settlements;

- the Company could discover additional material or immaterial errors in its financial statements; and

- two of the Company's credit ratings have been placed "On Credit Watch" and "Ratings Under Review," and if the ratings are effectively downgraded, the Company's access to the credit markets and its ability to fund its working capital and capital expenditures may be affected.

179. With respect to the SEC and DOJ investigations, the 2023 10-K represented that: (i) "[e]xpenses incurred in connection with these investigations . . . could adversely affect the Company's liquidity position"; (ii) ADM "may be required to pay material fines, consent to injunction on future conduct or be subject to other penalties, each of which could have a material adverse effect on its business, results of operations, financial condition and liquidity"; (iii) "[t]hese government investigations may adversely affect the Company's ability to obtain, and/or increase the cost of obtaining, directors' and officers' liability insurance and/or other types of insurance"; (iv) "the findings and outcomes of the Investigation as well as the government investigations could result in additional litigation or actions taken by third parties against the Company"; and (v) "[t]he effects and results of such other litigation or actions may have a materially adverse effect on the Company's business, results of operations, financial condition and liquidity."

180. On April 22, 2024, the Company announced that it reached agreement to terminate Defendant Luthar's employment via "resignation," which would be effective as of September 30, 2024.

**ADM's Financial Statements Were False and Misleading**

181. During the Relevant Period, ADM's financial statements were included in quarterly reports filed on Forms 10-Q and annual reports filed on Forms 10-K with the SEC. As discussed *inter alia*, each of the financial statements made during the Relevant Period were materially false and misleading.

**The Restatement is an Indicia of Falsity**

182. By restating its historical segment results, ADM has conceded that the initially reported financial results and related disclosures were false and misleading and not prepared in accordance with GAAP. More specifically, the Restatement admitted that "certain intersegment sales between the Nutrition reporting segment and the Ag Services and Oilseeds and Carbohydrate Solutions reporting segments" were "reported at amounts that were not in accordance with [GAAP] ASC 606, Revenue from Contracts with Costumers." The Restatement also admitted that, for six years, intersegment sales "were not recorded at amounts approximating market." Instead, intersegment sales were recorded at below market rates to increase Nutrition segment profits.

183. To address the GAAP violations and misstatements, the Restatement lowered the previously reported Nutrition segment operating profits for each year from 2018 through 2023. Accordingly, the Company admitted that the Nutrition segment's operating profit was falsely

overstated in the financial statements issued during the Relevant Period by tens of millions of dollars. As a result, the originally issued financial statements were admittedly false and misleading.

**The Inflated Nutrition Segment Results Violated GAAP**

184. The Company's financial statements were not prepared in accordance with GAAP and violated ASC 280 Segment Reporting, and ASC 606 Revenue from Contracts with Customers.

185. Segment reporting is critical for public companies because it allows investors to understand a public entity's performance at a more granular level, segment-by-segment, rather than solely as a whole, assess each segment's prospects for future cash flows and thereby, make more informed judgments about whether to invest. ASC 280-10-10-1. Companies must present financial information concerning segments using the "management approach." ASC-280-10-05-3. According to Ernst & Young Global Limited's guidance on segment reporting, the management approach requires "segment information to be reported based on how management internally evaluates the operation performance of the company's business units or segments[.]"[6]

186. Segment reporting is supposed to permit "investors to see the company through the eyes of management[.]" Reporting accurate and complete financial information using the management approach for segment reporting is mandatory under GAAP.[7] Further, GAAP requires that in addition to reporting consolidated financial results for the whole entity,

---

[6] Financial reporting developments, A comprehensive guide, Segment reporting, Accounting Standards Codification 280, EY (Apr. 2023) ("EY Segment Reporting Guidance"), https://www.ey.com/en_us/technical/accountinglink/financial-reporting-developments-segment-reporting (last accessed: April 14, 20205).

[7] SEC Release No. 33-8350, Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations (December 29, 2003). See also generally ASC 280-10.

companies must disclose their basis of accounting for intersegment transactions, including sales, when reporting each segment's results. ASC 280-10-50-29.

187. Accounting firms have identified intersegment and intercompany accounting as an area that is ripe for accounting fraud because the Company stands on both sides of the transaction and thus, can readily manipulate the transactions to serve an illicit purpose. In the context of a major, multinational company like ADM, intercompany transactions can involve millions of dollars. Further, individual segment performance may take on particular importance for investors based on a confluence of factors, such as the segment's standing within the entity and/or the focus of management. In such context, the risk of intersegment transactions and financial reporting thereof being fraudulent is drastically higher. For instance, in its publication entitled "Cleaning up the mess under the bed," Deloitte discussed the proliferation of companies that used intercompany transactions and accounting to manipulate their financial results and resulted in material financial misstatements, reporting of material weaknesses in internal controls, and regulatory investigations.

188. Here, ADM disclosed to investors in its Forms 10-Q and 10-K that intersegment sales were being recorded "at amounts approximating market." These misstatements caused investors to believe that the Individual Defendants were not manipulating internal sales through discounts or rebates when ADM's legacy segments sold raw materials to the Nutrition segment. However, in reality and as was later revealed, ADM engaged in a six-year long accounting scheme through which it manipulated intersegment sales, in violation of GAAP and Company policy, to inflate the Nutrition segment's financial results and specifically, its operating profit.

189. ADM's admission that sales from its legacy segments to the Nutrition segment were recorded below market rates was an admission that the Company violated its own publicly

stated accounting policy and GAAP. Through these manipulated sales, the Individual Defendants were able to inflate the Nutrition segment's reported operating profits for six consecutive years.

**Contrary to Defendants' Representations, ADM's Internal Controls Were Ineffective**

190. During the Relevant Period, the Individual Defendants repeatedly stated that the Company's internal control over financial reporting had been evaluated, were effective, and had been designed to provide reasonable assurance that ADM's financial statements were prepared in accordance and compliant with GAAP. However, these repeated, boilerplate statements were not true.

191. In reality, ADM suffered from a years-long weakness in its internal controls. As a result, management's representations regarding the effectiveness of the Company's internal controls over financial reporting were materially false and misleading. The Restatement admitted as much, stating:

> Under the supervision and with the participation of management, including the Company's Chief Executive Officer and interim Chief Financial Officer, the Company's management assessed the design and operating effectiveness of the Company's internal control over financial reporting as of December 31, 2023, based on the framework set forth in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework). Based on this assessment, management concluded that the Company's internal control over financial reporting was not effective as of December 31, 2023 and 2022, due to the material weakness described below.

192. Internal disclosure controls are designed and implemented to ensure that financial statements are accurate and free of false and misleading representations or omitted disclosures. However, despite prior contrary representations, ADM made a virtually identical admission regarding the material weakness in its internal controls for disclosure:

> An evaluation was performed under the supervision and with the participation of the Company's management, including the Chief Executive Officer and interim Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as such term is defined in Rules

> 13a15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act"), as of December 31, 2023. Based on that evaluation, the Company's Chief Executive Officer and interim Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2023 and 2022, due to the material weakness described below.

193. ADM also addressed the Company's material weakness due to the improper accounting treatment of intersegment sales below market rate:

> The material weakness resulted from inadequate controls that allowed for certain intersegment sales to be reported at amount that were not in accordance with ASC 606, Revenue from Contracts with Customers. Specifically, the Company did not have adequate controls in place around measurement of certain intersegment sales between the Nutrition reporting segment and the Ag Services and Oilseeds and Carbohydrate Solutions reporting segments. The absence of adequate controls with respect to the reporting of intersegment sales impacted the accuracy of the Company's segment disclosures and review controls over projected financial information utilized in goodwill and other long-lived asset impairment tests.

194. Thus, although the Company had previously represented that it had designed, implemented and maintained effective internal controls and that the internal controls were effective in ensuring that the Company was recording intersegment sales at price, the Company's internal controls were not effective and did not prevent such misconduct.

195. The material weaknesses in internal controls existed throughout the entire six-year Relevant Period despite management's representations to the contrary. This is patent because ADM's false and misleading statements regarding the Nutrition segment's operating profits extend over a six-year period starting in 2018. Indeed, in each Form 10-Q filed during the Relevant Period the Individual Defendants affirmed that there was "no change in the Company's internal controls over financial reporting," which confirms that ADM never had adequate controls over segment reporting during the entire Relevant Period. Accordingly, the Individual Defendant's Relevant Period to the contrary were false and misleading.

**The Misstatements Concerning the Company's**
**Results and Ineffective Controls Were Material**

196. The Individual Defendants' misstatements and omissions regarding the Company's accounting, financial results and internal controls were material under GAAP and to investors.

197. The SEC staff issued Staff Accounting Bulletin Noo. 99 ("SAB 99"), now codified at ASC 250-10-S99. SAB 99 explains the methods through accountants should evaluate materiality when it concerns the financial statements SEC registrants:

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

198. SAB 99 explicitly states that materiality "in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws." The materiality analysis is both qualitative and quantitative. SAB 99 explains that "there are numerous circumstances in which misstatement below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material." Consistent with this approach, the Financial Accounting Standards Board "has long emphasized that materiality cannot be reduced to a numerical formula." In any event, the financial results here that the Individual Defendants originally reported were materially misstated both quantitatively and qualitatively, both individually and – most importantly – from an overall assessment, which is required by SAB 99.

199. GAAP requires correction and restatement only when the errors in financial statements are material. For example, GAAP expressly provides that "[t]he provisions of the Codification need not be applied to immaterial items." ASC 105-10-05-6. Accordingly, ADM's

public correction of the Company's Nutrition operating profit and internal controls from 2018 through 2023 is an admission that the overstatements and ineffective controls during the Relevant Period were material.

200. Similarly, public companies must disclose material weaknesses in internal controls when internal controls are rendered ineffective. An internal control problem is a material weakness if there "is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." ASC 5.A7. Consistent with that principle, ADM reported a material weakness in its internal controls and that internal controls for financial reporting were rendered ineffective, and that, in turn, the material weakness resulted in the misstatement of the Nutrition segment's operating profits. Accordingly, ADM admitted that the ineffectiveness of its internal controls failed to prevent the "material misstatement of the company's annual or interim financial statements" and were material. ASC 5.A7.

201. The stark movement in the Company's stock price also confirms that the misstatements and omissions regarding ADM's financial results and internal controls were material. For example, SAB 99 states that "demonstrated volatility of the [stock] price … in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." Here, when investors learned the truth about the years-long accounting scheme, ineffective internal controls and the overstated Nutrition segment's operating profits, the market's negative reaction was historic and thus, supports qualitative materiality.

**The Restatement Was Quantitatively Material**

202. During the Relevant Period, the Nutrition segment's results were overstated by as much as 10.2% on an annual basis and 25% on a quarterly basis due to the accounting fraud and GAAP violations. For six consecutive years, the accounting fraud and resultant GAAP violations caused the inflation and overstatement of the Nutrition segment's results.

203. ADM's Restatement resulted in the repeated and material overstatement of the Nutrition segment's operating profit, which aside from fiscal year 2020 always crushed SAB 99'S quantitative threshold – 5% - for materiality. In every other year, as illustrated in the chart below the Company's operating profit exceeded the threshold:

| **NUTRITION SEGMENT<br>OPERATING PROFIT OVERSTATEMENT PERCENTAGE** | | | | | | |
|---|---|---|---|---|---|---|
| $ (in millions) | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 |
| Reported Nutrition OP | $339 | $418 | $574 | $691 | $145 | $458 |
| Restated Nutrition OP | $312 | $391 | $558 | $632 | $668 | $427 |
| Overstatement % | 8.7% | 6.9% | 2.9% | 9.3% | 10.2% | 7.3% |

204. Further, consistent with the misstatements identified *supra*, ADM and Individual Defendants would make statements concerning the operating profits for the Animal Nutrition

sub-segment. As part of the Restatement, Animal Nutrition's results were reduced by as much as 660%. Indeed, the operating profits for Animal Nutrition were substantially overstated in FY 2021 (37.5%), FY 2022 (53.2%), fourth quarter of 2022 (94.4%) and first nine months of 2023 (660%). Accordingly, the misstated financial results were quantitatively material.

**The Restatements Were Qualitatively Material**

205. In addition to being unquestionably quantitatively material, the Nutrition segment's overstated results were also materially misleading based on qualitative measures.

206. First, the initially reported and inflated Nutrition segment's operating profits were qualitatively material because management intentionally represented such to manipulate earnings. SAB 99 guides that "where management has intentionally misstated items in the financial statements to 'manage' reported earnings" evidence of such "may be particularly compelling." Further, SAB 99 continues that: "[i]n that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements."

207. In this case, the Individual Defendants implemented an accounting scheme for six consecutive years in which they took profits every year from the Company's less attractive legacy businesses in order to prop up the profits of the more attractive Nutrition segment. While accounting literature and SAB 99 contemplate complex accounting issues where nuance may be required in reviewing the error, that is not the case here. The Individual Defendants repeatedly represented that intersegment sales were being recorded at market rates – the rates that are readily discernible from the segments themselves – and then booked the sales beneath market rates for a period of six years, falsely inflating the Nutrition segment's operating profit by more than $220 over six years. This is not a mistake resulting from a single faulty estimate or a close

call that required accounting judgment. Instead, the Company, by and through the Individual Defendants, repeatedly violated the straightforward policy for six consecutive years.

208. Importantly, the Company has never identified a material weakness in its accounting or sales reporting relating to sales from the legacy segments to external customers. The violations and material weaknesses were limited only to intersegment sales to the Nutrition segment, which evinces that the accounting fraud was intentional and for the purpose of boosting the Nutrition segment's operating profit.

209. Second, the overstated Nutrition segment results concealed negative trends in the segment and thus, were qualitatively material. Pursuant to SAB 99, the determination of "whether the misstatement masks a change in earnings or other trends" could result in a quantitatively small misstatement nonetheless satisfying qualitative materiality. As an example of this, ADM originally reported Animal Nutrition operating results growing 10.4% between 2021 and 2022, however, after revelation of the accounting fraud, the restatement revealed that Animal Nutrition operation profits were flat to slightly down year-over-year and the Individual Defendants were forced to change their disclosure that Animal Nutrition's 2022 results were merely "comparable" and not "higher" when compared to 2021. Accordingly, the Company was able to mask a negative trend and instead, report robust growth and as a result, the overstatement was qualitatively material.

210. Third, the overstated financial results satisfy qualitative materiality because, consistent with the Individual Defendants' repeated representations to the market, how paramount the Nutrition segment was to ADM. According to SAB 99:

> The materiality of a misstatement may turn on where it appears in the financial statements. For example, a misstatement may involve a segment of the registrant's operations. In that instance, in assessing materiality of a misstatement

> to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole. "A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity" is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important. In assessing the materiality of misstatements in segment information – as with materiality generally – situations may arise in practice where the auditor will conclude that a matter relating to segment information is qualitatively material even though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a whole.

211. The Nutrition segment does not qualify as a small segment considering it was one of just three reporting segments and represented up to 17% of ADM's annual operating profit in the Relevant Period. Further, the Individual Defendants made clear that the Nutrition segment was integral to the Company's future as ADM's "fasted growing segment" that would "replace" the legacy segments' volatile and low-margin business with "predictable," "stable," and "robust" earnings. Indeed, the Individual Defendants signaled to the market that the Nutrition segment was their focus, not just by their words, but by changing executive compensation metrics to be aligned with ADM's "focus on the Nutrition segment." The Individual Defendants repeatedly touted lofty Nutrition segment operating profit goals to the market.

212. Further, in addition to Individual Defendants' representations regarding the Nutrition segment and tying executive compensation to its results, the Company had also invested "just over $6 billion" in building the Nutrition segment and promised continued investment via "bolt-on acquisitions."

213. Materiality is further confirmed by investor and analyst reaction. For example, on January 21, 2024, ADM announced that Ag Services and Oilseeds and Carb Solutions were not implicated in the accounting issues and were expected to report results "in line" with prior

guidance and yet, analysts and investors still reacted negatively based solely on the news affecting the Nutrition segment. Investors suffered major losses as the Company's stock price endured the largest, single-day percentage decline since 1929. Likewise, an analyst from Jeffries cut their price target even though "given transfer pricing is at issue, we expect any restatement to be a headwind for Nutrition segment and a tailwind for AS&O." A UBS analyst cut ADM's price target by more than half and a Stephens analyst withdrew their price target altogether.

214. After the Company issued the Restatement, a Barclays analyst stated that the "significant" write-down of the Nutrition segment's profits would have a material impact on ADM's business and valuation, as follows:

> While the overall shift in profitability is small, given the large existing segment profits for ASO and Carb Solutions, the significant reduction in Nutrition [profits] nonetheless remains a concern. The segment was positioned as a growth catalyst, providing the company with stable profitability unaffected by volatile commodity prices. As such, a step back in profitability limits near-term growth and the segment's long term viability as a continued driver.

215. Accordingly, the Restatement, which eliminated more than $220 million in total profits from the Nutrition segment, had a substantial impact on the paramount Nutrition segment, which confirms that the Restatement was qualitatively material.

216. Fourth, SAB 99 explains that the determination of "whether the misstatement changes a loss into income or vice versa" can be an indicator of qualitative materiality. In this instance, for the nine months ended September 30, 2023, ADM initially reported Animal Nutrition operating profit of $28 million. The Restatement revealed that the Animal Nutrition operating profit was overstated by $33 million, which changed the $28 million profit to ($5 million) loss for the nine months ended September 30, 2023.

217. In sum, considering from the perspective of a reasonable investor the confluence of factors including the Individual Defendants' admissions, the importance of the reporting segment affected, the length of time that the accounting scheme was ongoing, the masking of adverse trends, the historic stock price change, analyst reactions, and the portrayal of losses as profits, it is patent that the initially reported financial results were materially misstated.

**The Company's Use of Revisions Instead of Restatement**
**Does Not Change the Materiality Analysis or Result**

218. ADM and the Individual Defendants attempted to frame the Restatement as a mere "correction" or accounting errors alongside the resultant disclosure of "revised" prior financial results and attempting to sell the market that the revisions were "not material to the Company's consolidated financial statements taken as a whole for any period." With this framing, the Company and Individual Defendants have tried to minimize the significance of the Restatement by issuing what is known as a "little r" restatement, rather than a "Big R" restatement. In a March 9, 2022, speech entitled "Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors," SEC Chief Accountant Paul Munter ("Munter") discussed the concepts of "Big R" and "little r" restatements, stating as follows:

> When an error is determined to be material to previously-issued financial statements, the error must be corrected by restating the prior-period financial statements. This type of restatement is sometimes referred to colloquially as a reissuance restatement or a "Big R" restatement.
>
> If the error is not material to previously-issued financial statements, but either correcting the error or leaving the error uncorrected would be material to the current period financial statements, a registrant must still correct the error, but is not precluded from doing so in the current period comparative financial statements by restating the prior period information and disclosing the error. This type of restatement is sometimes referred to colloquially as a revision restatement or a "little r" restatement.

219. In referring to the Restatement as a "correction" and "revised" results, the Individual Defendants and the Company are inferring that the restated results were material only to the current period's financial results, but not to all of the prior reported results. However, this classification is not determinative under either relevant accounting rules or the legal determination of materiality to investors. While ADM and the Individual Defendants have, for self-interested purposes, downplayed the importance of the Restatement for investors, this is soundly refuted on a multitude of fronts.

220. First, the distinction between a "little r" and "Big R" restatement has been downplayed because, as Mr. Munter explained, both "constitute restatements to correct errors in previously-issued financial statements as those are defined in U.S. GAAP [and i]n either case, such errors should be transparently disclosed to investors." Further, that the reporting entity has the ability to frame changes reduces the significant of the distinction. For instance, an accounting lecturer at the University of Miami discussing ADM's use of a "little r" restatement as opposed to a "Big R" restatement, declared it a matter of "technical semantics" and acknowledged the issues are significant "even if they didn't make the disclosure that they had a "Big R" restatement."[8] In his speech, Mr. Munter acknowledged a trend towards "little r" restatements over "Big R" Restatements and noted management's fear of compensation loss and liability creates a real risk of bias in selecting the label, stating, in pertinent part:

> An objective analysis should put aside any potential bias of the registrant, auditor, or audit committee that would be inconsistent with the perspective of a reasonable investor. For example, a restatement of previously-issued financial statements may result in the clawback of executive compensation, reputational harm, a decrease in the registrant's share price, increased scrutiny by investors or

[8] Nicola M. White, *Bigger Problems for ADM Lurk Within Small Accounting Error Fix*, Bloomberg (Mar. 13, 2024), https://news.bloombergtax.com/financial-accounting/bigger-problems-for-admlurk-within-small-accounting-error-fix (last accessed April 14, 2025).

> regulators, litigation, or other impacts. An assessment where a registrant's, auditor's, or audit committee's biases based on such impacts influenced a determination that an error is not material to previously-issued financial statements so as to avoid a Big R restatement would not be objective and would be inconsistent with the concept of materiality.

221. Second, ADM's contention that the restated Nutrition segment operating profits are immaterial "to the Company's consolidated financial statements taken as a whole for any period" is undoubtedly driven by bias. Under the Company's labeling, the accounting fraud here, built on intersegment sales, could never effect the "consolidated financial statements" because the revenue and profits from the sales are cancelled out in the consolidation process. ASC 810-10-45-1. Accordingly, under the Company's assessment, no matter how large an intercompany fraud is, it would never be material to the Company's consolidated financial statements regardless of any qualitative assessment. This self-interested labeling and conclusion is contrary to the accounting standards, SEC guidance and most importantly, contradicts the Individual Defendants' actions and statements during the Relevant Period, which repeatedly drove investor and analyst focus to the Nutrition segment's results.

222. Third, when the accounting fraud was revealed, investor and analyst reaction was swift and decisive. The stock price declined dramatically and in historic fashion, which evinces that the restatement regardless of the Company's framing was material. Additionally, the Securities Class Action was filed on behalf of investors and that has survived a motion to dismiss.

223. Fourth, the SEC and DOJ have opened investigations, which included the use of grand jury subpoenas on current and former ADM employees by the DOJ. If these were mere immaterial revisions, it is not only unlikely that the stock price would suffer a historic decline, but that the regulators would be actively investigating such misconduct.

224. Fifth, from the perspective of the reasonable investor, the Company's accounting violations and the years-long overstatement of the Nutrition segment's profits were material. In his speech, Mr. Munter explained how this applies when considering the issue of "little r" or "Big R" restatement, as follows:

> Central to the process a registrant must follow when an error is identified in its historical financial statements is determining whether the error is material to those historical financial statements. The Supreme Court has held that a fact is material if there is: "a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

225. Based upon the requirement of SAB 99 that requires the materiality assessment to be reviewed through the eyes of "the reasonable investor," the GAAP violations and overstatements of the Nutrition segment's operating profits were quantitatively and qualitatively material given: (i) the critical role that the Nutrition segment played in the Company's financial statements, stock price and future outlook; (ii) the substantial impact that the overstatements had on the Nutrition segment's operating profits; (iii) the fraudulent operating profits masked negative trends and reversed losses with the Nutrition segment; (iv) the intentional and longstanding natures of the fraud conducted in violation of straightforward accounting standards and Company policy; and (v) the volatility of the stock price after revelation of the intersegment accounting issues.

**<u>INSIDER TRADING ALLEGATIONS</u>**

226. The Individual Defendants benefitted from inflation of the Nutrition segment's financial results, not only through tying compensation to its results, but also by selling ADM stock at artificially inflated prices during the Relevant Period. During the Relevant Period as the Individual Defendants made false and misleading statements and the market absorbed that

information, the Company's stock price rose from around $35 per share at the outset of the Relevant Period to highs of approximately $98 in 2021 and 2022.

227. During this timeframe and with knowledge of the ongoing accounting fraud and that the Company's public filings were materially false and misleading, Defendants Luciano, Young Macciocchi, and Luthar sold over 1.3 million shares of ADM common stock returning proceeds of $107 million. Additionally, Defendants Burke ($123,000), Harrison ($471,000), Sandler ($688,000), and Westbrook (over $2 million) all benefitted from making insider sales at artificially inflated prices.

**Officer Defendant Insider Sales**

228. In the four years prior to the start of the Relevant Period, Defendant Luciano did not report a single sale of ADM stock. However, Defendant Luciano broke this pattern when ADM was trading at artificially inflated prices, selling a collective 1.047 million shares over multiple rounds. Based on these sales, Defendant Luciano received a total of $83 million in proceeds from these insider sales during the Relevant Period. In some instances, sales occurred immediately after the release of fraudulent results and false and misleading statements. For example, Defendant Luciano received over $20 million from insider sales on January 31, 2022, which was just six days after the Company announced financial results for fourth quarter and full year of 2021. In connection with these results, Defendant Luciano called the Nutrition segment's results "extremely strong" and falsely reported that the Nutrition segment's operating profits reached $691 million in 2021. In a seven week span in late 2022, Defendant Luciano sold approximately 584,000 shares while the stock traded as high as over $90 per share and netted approximately $32 million in profits.

229. Similar to Defendant Luciano, Defendant Young did not report a single sale of ADM stock in the four years prior to the start of the Relevant Period. During the Relevant Period and while ADM stock was artificially inflated, Defendant Young sold 235,643 shares of stock on open market and collected over $15.9 million in proceeds from the insider sales.

230. Defendant Macciocchi, like Defendants Luciano and Young, did not report a stock sale in the four years prior to the Relevant Period. However, Defendant Macciocchi sold 93,110 shares of ADM on a single trading day during the Relevant Period, receiving over $7 million in proceeds and netting an estimated $4 million in profits. These sales came just weeks after Defendant Macciocchi and other Individual Defendants boasted about the Nutrition segment's success and the expectation that organic growth could yield Nutrition operating profits of $1.25-$1.5 billion by 2025. Defendant Luthar also sold 7,500 shares of ADM for around $89.59 per share approximately halfway through the Relevant Period, for these sales Luthar received over $670,000 in proceeds and netted an estimated $400,000 in profits.

231. Collectively, the Officer Defendants sold 1.383 million ADM shares during the Relevant Period. These sales were conducted at an average stock price of approximately $77 per share. If these shares were conducted prior to the Relevant Period or after the accounting fraud was disclosed to the market, the share would have sold at a price around $50 per share. Accordingly, and as a result of the inflation in the stock price driven by the accounting fraud, the Officer Defendants reaped more than $35 million in insider trading proceeds during the Relevant Period compared to what they would have received before or after the disclosure of the accounting fraud.

**Director Defendant Insider Sales**

232. Certain Director Defendants also benefitted from offloading substantial amounts of ADM common stock at artificially inflated prices during the Relevant Period. These insider sales were made with knowledge of material, nonpublic, adverse information prior to revelation of the accounting fraud and the true condition of the Nutrition segment.

233. Defendant Burke received over $123,000 from insider sales of 1,600 shares of ADM stock on the basis of material non-public information. The proceeds from these stock sales represent nearly 100% of Defendant Burke's base salary and one-third of his total compensation from the Company in fiscal year 2023.

234. Defendant Harrison received over $471,000 from inside sales of over 6,000 shares of ADM stock on the basis of material non-public information. The proceeds from these stock sales are nearly four times Defendant Harrison's director fees and 1.2 times her total compensation from the Company in fiscal year 2023.

235. Defendant Sandler received over $688,000 from insider sales of over 8,400 shares of ADM stock on the basis of material non-public information. The proceeds from these stock sales are over 5.5 times her director fees and nearly double her total compensation from ADM for the fiscal year 2023.

236. Defendant Westbrook received over $2,000,000 from insider sales of over 28,900 shares of the Company's stock on the basis of material non-public information. The proceeds from these stock sales are over 16 times his director fees and nearly five times his total compensation from ADM for the fiscal year 2023.

237. Collectively, these Director Defendants sold over 44,9000 shares of Company stock at artificially inflated prices during the Relevant Period and reaped more than $3.28 million

and $1.03 million more than if they had made such sales before the Relevant Period or after the disclosure of the accounting fraud and true condition of the Nutrition segment.

## DAMAGE TO THE COMPANY

### Securities Class Action

238. On January 24, 2021, a securities class action complaint was filed in the United States District Court for the Northern District of Illinois against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Chow v. Archer-Daniels-Midland Company, et al.*, Case 1:24-cv-00634 (N.D. Ill.) ("Securities Class Action").

239. On March 12, 2025, the Court denied each of the four-filed motions to dismiss the Securities Class Action and thereby permitted the plaintiffs; claims to proceed in full. Accordingly, and as a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers and will now face additional costs as the matter proceeds with discovery and substantive litigation. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results, which could be substantial given that the Company's market capitalization declined $8 billion upon disclosure of the truth.

240. With respect to the element of "falsity," the Court held that "ADM conceded in its corrected 10-K that it misstated its accounting practices" was "sufficient to plausibly establish with particularity the falsity of the statements regarding the Nutrition segment's accounting." Securities Class Action, ECF No. 109, p.6. Moreover, the Court held that "[i]f Defendants plausibly knew the statements about the accounting were false, then Defendants plausibly also

knew that their statements about the Nutrition segment's profits and ADM's internal controls were also false." Id. Indeed, "[t]his is because it cannot be true that a company conducting fraudulent accounting (1) can be said to have sufficient internal controls, and (2) can be said to have legitimate reported profits." Id.

241. With respect to the element of "scienter," the Court acknowledged that the "primary evidence of scienter centers on the Individual Defendants' pecuniary interests" and specifically references that "after the false accounting practice was implemented, Defendants changed their compensation structure to benefit from it." Id., p. 7-8. Additionally, the Court was persuaded by the fact that "Defendants then took advantage of the Nutrition segment's allegedly fraudulent profit reports by selling stock during the class period." Id., p. 8. The Court also noted that "the accounting fraud did not involve complex accounting standards or require the exercise of judgment[,]" and "ADM followed this GAAP policy for sales between its other two business segments but violated the same GAAP policy for transfers to the Nutrition segment." Id., p. 8-9. The Court held that "[i]n this context, the apparent simplicity of the accounting fraud provides further support for a strong inference of knowing or deliberate disregard." Id., p. 9. The Court was also persuaded by the fact that "several of the Individual Defendants left their positions after the false reports were disclosed, and ADM is the subject of government investigations based on the false reports to the SEC." Id., p. 9.

**Unjust Compensation**

242. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants ***over $144.4 million*** during the Relevant Period in connection with their respective roles as officers and/or directors of the Company, as follows:

| | TOTAL COMPENSATION ($) | | | | |
|---|---|---|---|---|---|
| **Defendant** | **2020** | **2021** | **2022** | **2023** | **Total** |
| Luciano | 22,749,628 | 23,508,841 | 24,749,178 | 24,414,668 | 95,422,315 |
| Young | 8,813,194 | 8,094,974 | 7,755,200 | - | 24,663,368 |
| Luthar | - | - | 4,438,427 | 4,516,241 | 8,954,668 |
| Burke | 300,000 | 329,735 | 347,369 | 384,355 | 1,361,459 |
| de Brabander | - | - | - | 214,968 | 214,968 |
| Colbert | - | 207,038 | 329,209 | 337,107 | 873,354 |
| Collins | - | - | 133,514 | 328,453 | 461,967 |
| Crews | 325,000 | 397,773 | 424,279 | 451,421 | 1,598,473 |
| Dufour | 300,000 | 347,738 | 137,026 | - | 784,764 |
| Felsinger | 330,000 | 464,704 | 503,904 | 280,295 | 1,578,903 |
| Harrison | 310,000 | 345,995 | 372,058 | 383,592 | 1,411,645 |
| Moore | 320,000 | 441,798 | 465,414 | 495,912 | 1,723,124 |
| Sanchez | 300,000 | 346,352 | 360,959 | 140,140 | 1,147,451 |
| Sandler | 300,000 | 341,694 | 361,484 | 368,491 | 1,371,669 |
| Schlitz | 300,000 | 324,039 | 341,074 | 350,724 | 1,315,837 |
| Westbrook | 320,000 | 405,072 | 419,575 | 428,053 | 1,572,700 |
| **TOTAL** | **34,667,822** | **35,555,753** | **41,138,670** | **33,094,420** | **144,456,665** |

243. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

244. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

245. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

246. Additionally, the Company will suffer further losses in relation to the federal investigations brought forth by the SEC and DOJ from legal fees, to costs associated with cooperation, loss of opportunity, as well as the substantial likelihood of fines and/or sanctions.

247. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

248. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

249. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

250. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Audit Committee Charter**

251. The Audit Committee assists the Board in the oversight of (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function.

252. The Audit Committee Charter states in relevant part:

> Authority and Responsibilities
>
> The Committee shall provide assistance to the Board in fulfilling its oversight responsibility to the shareholders relating to the Company's financial statements and the financial reporting process, preparation of the financial reports and other financial information provided by the Company to any governmental or regulatory body, the systems of internal accounting and financial controls, the internal audit function, the tax function, the annual independent audit of the Company's financial statements, the Company's major risk exposures, the legal compliance and ethics programs as established by management and the Board, and the Company's compliance function. The Committee shall assure that the corporate information gathering, analysis, and reporting systems developed by management represent a good faith attempt to provide senior management and the Board with information regarding material acts, events, and conditions within the Company.
>
> The Committee shall be directly responsible for the appointment, compensation, retention, and oversight of the independent registered public accounting firm, including the resolution of any disagreements between management and the independent registered public accounting firm regarding financial reporting, and each independent registered public accounting firm shall report directly to the Committee. The Committee shall maintain free and open communication with the independent registered public accounting firm, the internal auditors, the Chief Compliance Officer, and management of the Company in fulfilling these responsibilities.
>
> In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities, and

> personnel of the Company and the power to retain external counsel or other experts or advisers for this purpose. The Committee shall approve the fees and other retention terms related to any such external counsel, experts, and advisors retained by the Committee. In addition, the Committee will promulgate, and have the authority to assure adherence to, policies and procedures regarding compliance with the law and procedures for circulating these policies and for educating employees regarding compliance with these policies. The Committee shall establish and maintain procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and the confidential, anonymous submission by employees of concerns regarding accounting or auditing matters, including any allegations of fraud or material misuse of Company resources. The Committee shall perform such other duties and responsibilities as may be assigned to the Committee by the Board.

**Sustainability And Corporate Responsibility Committee Charter**

253. The Sustainability and Corporate Responsibility Committee shall (1) have oversight responsibility for the Company's corporate objectives, goals, strategies, and activities relating to sustainability and corporate responsibility, and (2) assist the Board in ensuring that the Company operates as a sustainable organization and responsible corporate citizen in order to enhance shareholder value and protect the Company's reputation.

254. The Sustainability and Corporate Responsibility Committee Charter states:

> Authority and Responsibilities
>
> [] The Committee shall oversee (a) the Company's objectives, goals, strategies, and activities relating to sustainability and corporate responsibility, including workplace safety, process safety, environmental, social well-being, diversity and inclusion, corporate giving, and community relations, (b) the Company's compliance with sustainability and corporate responsibility laws and regulations, and (c) the Company's performance relating to its sustainability and corporate responsibility goals and industry benchmarks.
>
> [] The Committee shall receive and review reports from management regarding (a) the Company strategies and activities to support the Company's sustainability and corporate responsibility objectives, (b) the Company's compliance with sustainability and corporate responsibility laws and regulations, (c) the Company's performance relating to its sustainability and corporate responsibility goals and industry benchmarks, (d) significant risks to, and the physical security

of, the Company's facilities and employees and the public, (e) significant sustainability and corporate responsibility litigation and regulatory proceedings in which the Company is or may become involved, (f) trends, risks, legislations, regulations, public policies, judicial decisions, treaties, protocols, or medical or scientific developments relating to sustainability and corporate responsibility that may have a material effect on the Company's business, and (g) the Company's relationships with key sustainability and corporate responsibility stakeholders and the issues raised by those stakeholders.

[] The Committee shall perform such other duties and responsibilities as may be assigned to the Committee by the Board.

[] The Committee shall have authority to obtain advice and assistance from internal or external legal, accounting, sustainability, corporate responsibility, or other advisors. The Committee shall approve the fees and other retention terms related to any such advisors retained by the Committee.

[] The Committee may form and delegate authority to subcommittees where appropriate.

[] The Committee shall conduct an evaluation of its performance on an annual basis.

[] All actions of the Committee shall be regularly reported to the Board or submitted to the Board for ratification.

[] The Committee periodically shall review and assess the adequacy of this Charter and recommend any proposed changes to the Board for approval.

## DUTIES OF THE DIRECTOR DEFENDANTS

255. As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

256. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

257. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

258. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

259. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

260. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

261. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

262. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, gross mismanagement and other unlawful conduct by the Individual Defendants.

263. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

264. Plaintiff is a current owner of the Company's stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

265. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

266. The Company Board is currently comprised of twelve (12) members – Defendants Luciano, Burke, Colbert, Collins, Crews, de Brabander, Harrison, Moore, Sandler, Schlitz, and

Westbrook – make up eleven of twelve seats.[9] Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e., six* (6), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

267. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

268. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

269. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

270. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

---

[9] David R. McAtee II ("McAtee") joined the Board in November 2024. Plaintiff does not allege that demand would be futile or excused with respect to McAtee. McAtee, however, is just one Board member and his presence does nothing to change the demand futility analysis as demand remains futile as to a majority of the Board.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

**Defendant Luciano**

271. Defendant Luciano is not disinterested or independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all of his income from his employment with ADM, making him not independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Luciano cannot independently consider any demand to sue himself for breaching his fiduciary duties to ADM, because that would expose him to liability and threaten his livelihood.

272. As CEO, Defendant Luciano also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Luciano could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Luciano is therefore futile.

273. In addition, Defendant Luciano receives lucrative compensation in connection with his employment with the Company. Defendant Luciano is not independent from Defendants Westbrook, Colbert, Collins, and Schiltz as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Luciano. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Luciano could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

274. Defendant Luciano has served as a Company director at all relevant times hereto. As a director, Defendant Luciano was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Luciano failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

275. As a trusted Company director, Defendant Luciano conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

276. Moreover, Defendant Luciano signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Luciano faces a substantial likelihood of liability therefor.

277. Because of Defendant Luciano's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Luciano is unable to comply with his fiduciary duties and prosecute this action. Defendant Luciano is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

278. Defendant Luciano also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Luciano secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Crews, Collins, Colbert, Harrison, Moore, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) his executive compensation. Accordingly, Defendant Luciano faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

279. Defendant Luciano is neither independent nor disinterested. Any demand upon Defendant Luciano is futile and, thus, excused.

**Defendant Burke**

280. Defendant Burke has served as a Company director at all relevant times hereto. As a director, Defendant Burke was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Burke failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

281. As a trusted Company director, Defendant Burke conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

282. Defendant Burke also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Burke is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Burke failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Burke faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

283. Moreover, Defendant Burke signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Burke faces a substantial likelihood of liability therefor.

284. Additionally, in connection with his role as a Company director, Defendant Burke receives substantial income. Accordingly, Defendant Burke cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

285. Defendant Burke also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Burke secured, *inter alia*: (i) the re-election of himself along with Defendants Crews, Collins,

Colbert, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Burke faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

286. Defendant Burke is neither independent nor disinterested. Any demand upon Defendant Burke is futile and, thus, excused.

**Defendant Colbert**

287. Defendant Colbert has served as a Company director at all relevant times hereto. As a director, Defendant Colbert was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Colbert failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

288. As a trusted Company director, Defendant Colbert conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

289. Defendant Colbert also serves as a member of the Audit Committee and holds

additional duties by virtue thereof. In particular, Defendant Colbert is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Colbert failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Colbert faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

290. Additionally, in connection with his role as a Company director, Defendant Colbert receives substantial income. Accordingly, Defendant Colbert cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

291. Moreover, Defendant Colbert signed and therefore personally made the false and misleading statements contained in the 2021 10-K and 2022 10-K. As such, Defendant Colbert faces a substantial likelihood of liability therefor.

292. Defendant Colbert also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Colbert secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Crews, Collins, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii)

executive compensation. Accordingly, Defendant Colbert faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

293. Defendant Colbert is neither independent nor disinterested. Any demand upon Defendant Colbert is futile and, thus, excused.

**Defendant Collins**

294. Defendant Collins has served as a Company director at all relevant times hereto. As a director, Defendant Collins was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Collins failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

295. As a trusted Company director, Defendant Collins conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

296. Additionally, in connection with his role as a Company director, Defendant Collins receives substantial income. Accordingly, Defendant Collins cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation,

including himself.

297. Moreover, Defendant Collins signed and therefore personally made the false and misleading statements contained in the 2022 10-K. As such, Defendant Collins faces a substantial likelihood of liability therefor.

298. Defendant Collins also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Collins secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Crews, Colbert, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Collins faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

299. As noted in the Company's 2024 Proxy Statement, Defendant Collins was, during the Relevant Period, a director of Cibus, Inc. and Pivot Bio, which are companies that ADM had purchases from or sales to in 2023. As a result, Defendant Collins is not a disinterested director because he has a material interest in ADM's business with Cibus and Pivot Bio, thus impairing his independence.

300. Defendant Collins is neither independent nor disinterested. Any demand upon Defendant Collins is futile and, thus, excused.

**<u>Defendant Crews</u>**

301. Defendant Crews has served as a Company director at all relevant times hereto. As a director, Defendant Crews was required to, among other things: (i) ensure that the Company

complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Crews failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

302. As a trusted Company director, Defendant Crews conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

303. Additionally, in connection with his role as a Company director, Defendant Crews receives substantial income. Accordingly, Defendant Crews cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

304. Moreover, Defendant Crews signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Crews faces a substantial likelihood of liability therefor.

305. Defendant Crews also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Crews secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Collins, Colbert, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Crews faces a substantial likelihood of liability

for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

306. As noted in the Company's 2024 Proxy Statement, Defendant Crews was, during the Relevant Period, a director of WestRock Company which ADM had purchases from or sales to in 2023. As a result, Defendant Crews is not a disinterested director because he has a material interest in ADM's business with WestRock, thus impairing his independence.

307. Moreover, Defendant Crews has a longstanding business relationship with Defendant Harrison, stemming from at least 2020. Since 2015, Defendant Crews has served as a director of WestRock Company. At the same time, Defendant Harrison has also served as a director of WestRock Company since 2020. Thus, since 2020, Defendants Crews and Harrison have worked together at WestRock and have built a professional relationship with one another. As such, they are incapable of independently and disinterestedly considering a demand to sue each other.

308. Defendant Crews is neither independent nor disinterested. Any demand upon Defendant Crews is futile and, thus, excused.

**Defendant de Brabander**

309. Defendant de Brabander has served as a Company director at all relevant times hereto. As a director, Defendant de Brabander was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or

practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant de Brabander failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

310. As a trusted Company director, Defendant de Brabander conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

311. Defendant de Brabander also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant de Brabander is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant de Brabander failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant de Brabander faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

312. Additionally, in connection with her role as a Company director, Defendant de Brabander receives substantial income. Accordingly, Defendant de Brabander cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

313. As noted in the Company's 2024 Proxy Statement, Defendant de Brabander was, during the Relevant Period, and is the Executive Vice President of Innovation and Regulatory Affairs at Elanco, which ADM does business with. As a result, Defendant de Brabander is not a disinterested director because she has a material interest in, and stands to benefit from, ADM's business with Elanco, thus impairing her independence.

314. Defendant de Brabander is neither independent nor disinterested. Any demand upon Defendant de Brabander is futile and, thus, excused.

**<u>Defendant Harrison</u>**

315. Defendant Harrison has served as a Company director at all relevant times hereto. As a director, Defendant Harrison was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Harrison failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

316. As a trusted Company director, Defendant Harrison conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

317. Defendant Harrison also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Harrison is required to oversee, *inter*

*alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Harrison failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Harrison faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

318. Additionally, in connection with her role as a Company director, Defendant Harrison receives substantial income. Accordingly, Defendant Harrison cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

319. Moreover, Defendant Harrison signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Harrison faces a substantial likelihood of liability therefor.

320. Defendant Harrison also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Harrison secured, *inter alia*: (i) the re-election of herself along with Defendants Burke, Crews, Collins, Colbert, Moore, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Harrison faces a substantial likelihood

of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

321. As noted in the Company's 2024 Proxy Statement, Defendant Harrison was, during the Relevant Period, a director of WestRock Company and Ashland Global Holdings, which ADM had purchases from or sales to in 2023. As a result, Defendant Harrison is not a disinterested director because she has a material interest in ADM's business with WestRock and Ashland Global, thus impairing her independence.

322. Moreover, Defendant Harrison has a longstanding business relationship with Defendant Crews, stemming from at least 2020. Since 2020, Defendant Harrison has served as a director of WestRock Company. At the same time, Defendant Crews has also served as a director of WestRock Company since 2015. Thus, since 2020, Defendants Harrison and Crews have worked together at WestRock and have built a professional relationship with one another. As such, they are incapable of independently and disinterestedly considering a demand to sue each other.

323. Defendant Harrison is neither independent nor disinterested. Any demand upon Defendant Harrison is futile and, thus, excused.

**Defendant Moore**

324. Defendant Moore has served as a Company director at all relevant times hereto. As a director, Defendant Moore was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make

reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Moore failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

325. As a trusted Company director, Defendant Moore conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

326. Defendant Moore also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Moore is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Moore failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Moore faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

327. Additionally, in connection with his role as a Company director, Defendant Moore receives substantial income. Accordingly, Defendant Moore cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation,

including himself.

328. Moreover, Defendant Moore signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Moore faces a substantial likelihood of liability therefor.

329. Defendant Moore also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Moore secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Crews, Collins, Colbert, Harrison, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Moore faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

330. Defendant Moore is neither independent nor disinterested. Any demand upon Defendant Moore is futile and, thus, excused.

**Defendant Sandler**

331. Defendant Sandler has served as a Company director at all relevant times hereto. As a director, Defendant Sandler was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this,

Defendant Sandler failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

332. As a trusted Company director, Defendant Sandler conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

333. Defendant Sandler also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Sandler is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Sandler failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Sandler faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

334. Additionally, in connection with her role as a Company director, Defendant Sandler receives substantial income. Accordingly, Defendant Sandler cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

335. Moreover, Defendant Sandler signed and therefore personally made the false and

misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Sandler faces a substantial likelihood of liability therefor.

336. Defendant Sandler also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Sandler secured, *inter alia*: (i) the re-election of herself along with Defendants Burke, Crews, Collins, Colbert, Harrison, Moore, Luciano, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Sandler faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

337. As noted in the Company's 2024 Proxy Statement, Defendant Sandler was, during the Relevant Period, a director of Keurig Dr. Pepper Inc. and Pharmavite, which ADM had purchases from or sales to in 2023. As a result, Defendant Sandler is not a disinterested director because she has a material interest in ADM's business with Keurig Dr. Pepper Inc. and Pharmavite, thus impairing her independence.

338. Defendant Sandler is neither independent nor disinterested. Any demand upon Defendant Sandler is futile and, thus, excused.

**Defendant Schlitz**

339. Defendant Schlitz has served as a Company director at all relevant times hereto. As a director, Defendant Schlitz was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any

given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Schlitz failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

340. As a trusted Company director, Defendant Schlitz conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

341. Additionally, in connection with her role as a Company director, Defendant Schlitz receives substantial income. Accordingly, Defendant Schlitz cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

342. Moreover, Defendant Schlitz signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Schlitz faces a substantial likelihood of liability therefor.

343. Defendant Schlitz also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Schlitz secured, *inter alia*: (i) the re-election of herself along with Defendants Burke, Crews, Collins, Colbert, Harrison, Moore, Luciano, Sandler, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Schlitz faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the

Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

344. As noted in the Company's 2024 Proxy Statement, Defendant Schlitz was, during the Relevant Period, and is the Vice President and President, Global Products at Johnson Controls, which ADM had purchases from or sales to in 2023. As a result, Defendant Schlitz is not a disinterested director because she has a material interest in, and stands to benefit from, ADM's business with Johnson Controls, thus impairing her independence.

345. Defendant Schlitz is neither independent nor disinterested. Any demand upon Defendant Schlitz is futile and, thus, excused.

**Defendant Westbrook**

346. Defendant Westbrook has served as a Company director at all relevant times hereto. As a director, Defendant Westbrook was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Westbrook failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

347. As a trusted Company director, Defendant Westbrook conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

348. Additionally, in connection with his role as a Company director, Defendant Westbrook receives substantial income. Accordingly, Defendant Westbrook cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

349. Moreover, Defendant Westbrook signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Westbrook faces a substantial likelihood of liability therefor.

350. Defendant Westbrook also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Westbrook secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Crews, Collins, Colbert, Harrison, Moore, Luciano, Sandler, and Schlitz to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Westbrook faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

351. As noted in the Company's 2024 Proxy Statement, Defendant Westbrook was, during the Relevant Period, a director of Mosaic Company and T-Mobile US, Inc., which ADM had purchases from or sales to in 2023. As a result, Defendant Westbrook is not a disinterested director because he has a material interest in ADM's business with Mosaic Company and T-Mobile US, Inc, thus impairing his independence.

352. Defendant Westbrook is neither independent nor disinterested. Any demand upon Defendant Westbrook is futile and, thus, excused.

**Additional Reasons Demand is Futile**

353. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover the damages it has suffered and will continue to suffer thereby.

354. The Company, at all material times, had its corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this corporate governance, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

355. In violation of the of their duties to the Company, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of their fiduciary duties, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

356. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.

They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

357. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

358. Publicly traded companies, such as ADM, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

359. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

**COUNT I**

**(DIRECTOR DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT)**

360. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

361. Section 14(a) Exchange Act claims are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. Section 14(a) claims alleged do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

362. Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

363. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

364. Under the direction and watch of the Director Defendants, the Company's 2021, 2022, and 2023 Proxy Statements (the "Proxy Statements") failed to disclose the illegal scheme

described herein, and that the Company failed to maintain adequate controls and oversight to prevent such wrongful conduct, thus rendering the Proxy Statements false and misleading.

365. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the forgoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statements, including the election of directors, advisory approval of the executive compensation, and ratification of the Company's independent auditor.

366. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

367. Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT II**

**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES)**

368. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

369. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

370. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

371. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly

misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

372. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

373. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**COUNT III**

**(AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT)**

374. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

375. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

376. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

377. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT IV

## (AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS)

378. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

379. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

380. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

381. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT V

## (AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT)

382. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

383. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the

Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

384. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

385. Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**COUNT VI**

**(AGAINST THE DIRECTOR DEFENDANTS FOR AIDING AND ABETTING)**

386. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

387. The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Individual Defendants.

388. Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law as alleged herein, and failing to report the same.

389. As a result, the Director Defendants substantially assisted the Individual Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

390. As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

391. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT VII

## (AGAINST DEFENDANTS LUCIANO, YOUNG, MACCIOCCHI, LUTHAR, BURKE, HARRISON, SANDLER AND WESTBROOK FOR *BROPHY* INSIDER TRADING)

392. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

393. By reason their fiduciary roles as officers and/or directors of the Company, Defendants Luciano, Young, Macciocchi, Luthar, Bure, Harrison, Sandler and Westbrook (the "Insider Trading Defendants") specifically owed the Company the highest obligations of due care, good faith and loyalty.

394. As officers and directors of the Company the Insider Trading Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

395. When the Insider Trading Defendants sold their ADM stock, they were in possession of material, non-public, adverse information described above and sold Company stock on the basis of such information for collective proceeds of over $110 million.

396. As the use of the Company's proprietary information for the Insider Trading Defendants' own gain constitutes a breach of fiduciary duty, the Company is entitled to disgorge the illegal profits obtained thereby.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 14, 2025

By: /s/ Carl V. Malmstrom
Carl V. Malmstrom
Mark C. Rifkin
**WOLF HALDENSTEIN ADLER**

**FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60602
Tel: (312) 984-0000
Fax: (212) 686-0114
Email: malmstrom@whafh.com
Email: rifkin@whafh.com

Patrick Donovan (admission forthcoming)
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
Email: donovan@whafh.com